# CHARLESTON.

BOARD *et ux. v.* CALLIHAN *adm'r d. b. n.*

33    209
f63   239

*(GREEN, JUDGE, Absent.)

Submitted September 10, 1889.—Decided November 18, 1889.

1. LOST INSTRUMENTS—EVIDENCE—ACTIONS AGAINST HEIRS—GIFTS INTER VIVOS.

   A suit is brought upon an alleged lost bond, which is claimed to have been executed by C. and delivered to L., his granddaughter, for $1,500.00, dated in June, 1855, and payable after his death with interest from date, which execution, delivery and loss are denied, and the proof is considered insufficient to establish the same.

2. LOST INSTRUMENTS—EVIDENCE—PERSONAL REPRESENTATIVES.

   Although a judgment was obtained upon said obligation against the personal representative of C., it was not even *prima facie* evidence against the heir or devisee of his estate.

3. GIFT—DONOR AND DONEE.

   In establishing a gift *inter vivos*, it is essential to clearly establish the delivery to the donee.

4. LOST INSTRUMENTS—EVIDENCE.

   In order to maintain a suit to enforce the collection of an obligation claimed to be lost, it is essential not only that the loss

---

*On account of illness.

27

be proven, but that the terms of the contract be clearly and definitely established.

*A. G. Dayton* and *C. F. Teter* for appellant.

*J. H. Woods* for appellees.

English, Judge:

In the month of August, 1880. George W. Board and Lucinda Board filed a bill in chancery in the Circuit Court of Barbour county, in which they allege that William W. R. Callihan, the grandfather of the female plaintiff, departed this life in the month of December, 1874, at the residence of his son Charles S., in the state of Missouri; that he had been a resident of Barbour county for many years preceding his death; that he raised a family of five children—one daughter, Mary Jane, wife of James D. Hall, and four sons, two of whom, John Callihan and Charles S. Callihan, survive him; that Alexander Callihan died nearly thirty years before his father, leaving James P. Callihan, his son, who was made a party defendant to said suit, and that his other son, William Callihan, departed this life more than thirty years before the institution of said suit, leaving surviving him four children, to wit, the female plaintiff, and her brothers, Charles Callihan, who died unmarried and without issue in 1862 or 1863, and James Callihan, who died some time in 1866, leaving one child, named William E., who is still an infant, and resides in Missouri, and William F. Callihan; that the mother of the female plaintiff married again, and she was taken by her said grandfather, and made her home with him for several years, when she went to reside with her aunt Mary Jane Hall, who had no children of her own, and with whom she resided until the time of her marriage, in May, 1857.

She further alleges that her said grandfather, up to the 12th of December, 1873, was possessed of several valuable tracts of land in said county of Barbour, one of which was worth not less than $30,000.00, and other lands worth not less than $7,000.00; that she was left by the death of her father entirely dependent, and that her grandfather took her to his house, not only to be brought up, but to be treated as his daughter, and frequently declared his purpose to provide for

her out of his estate; that while there she was taught habits of industry and frugality, and rendered him good service while she remained with him.

She further alleges that in the year 1855 her said grandfather, William W. R. Callihan, came to the house of her aunt, where she was then living, and, for the express purpose of providing for her out of his estate, he executed and delivered to her his obligation, sealed with his seal, for the sum of $1,500.00, payable at the time of his death, with interest thereon from the date thereof, which was done deliberately and voluntarily, in pursuance of his intention long before that time formed and declared to her.

She further alleges that after the marriage of said plaintiff for the first year they lived away from her said aunt Mary Jane Hall, but afterwards removed to their farm, and there resided until the death of her uncle, in 1861, and after his death they resided in the same house with her aunt until her death, in 1866; that during this period, in consequence of the changes, confusion, and concealments made necessary by the civil war, the said obligation was lost, and can not since be found, although she could prove the execution and delivery of said obligation to her, and the repeated acknowledgment of its existence and validity by the obligor; that said obligation remained unpaid, and constitutes a valid debt against his estate in the hands of his administrator and voluntary alienees. Said plaintiffs further allege that said William W. R. Callihan made a will, which was probated in the Circuit Court of Barbour county, and John Callihan was appointed his administrator with the will annexed; that by said last will and testament he devised to said James P. Callihan, his grandson, 116 acres of land worth at least $3,500.00; directed other lands to be sold which were of little value; and also bequeathed $1,000.00 to the children of his grandsons William and James, and charged the 116 acres devised to James P. Callihan with the payment thereof; and also devised forty seven acres of land, worth $2,000.00, to the said children of his grandsons William and James; that he also bequeathed to John Callihan, $1,065.97. Plaintiffs also allege that all the property, real and personal, owned by the said testator at the time of his death, was liable for and chargeable with the pay-

ment of his debts, including the debt due the female plaintiff; that said William W. R. Callihan, by deeds dated the 12th of December, 1873, conveyed to James Stuart, trustee for the children of William F. Callihan, sixty four acres of land, worth at least $2,600.00; to Charles S. Callihan, 1,274 acres, worth at least $13,500.00; to John Callihan, 133 acres, worth $4,-500.00; and on the 24th day of September, 1874, to said John Callihan, another tract, containing 211 acres, worth at least $7,000.00—all of which deeds were voluntary, and without valuable consideration, except as to $1.500.00 from said Charles S. Callihan, which in fact had never been paid, and $800.00 from said John Callihan; and that an action of debt was brought on said obligation executed to her by William W. R. Callihan for $1,500.00, in the fall of 1879, and judgment obtained thereon against said John Callihan as administrator with the will annexed of William W. R. Callihan, deceased.

It appears that a demurrer was filed to plaintiffs' bill at September rules, 1880, and the same was set down for argument; and on the 23d of July, 1881, Charles S. Callihan and John Callihan filed their joint answer, in which they admit the execution and delivery of the deeds of conveyance in the bill mentioned, but deny that they were voluntary. They also admit that the female plaintiff was the granddaughter of the said William W. R. Callihan, but deny that during her infancy the said William W. R. Callihan, her grandfather, declared his intention of providing liberally for her, with the purpose of enabling her to make a suitable alliance; but admit that it is true that he took an interest in her welfare, and tried to control her for her best interests, but that she was perverse and willful, and married said George W. Board against his earnest solicitations, and after her marriage he frequently declared he would do nothing for her. They deny that said William W. R. Callihan made and delivered to said Lucinda, the female plaintiff, the bond or obligation for $1,500.00 described in plaintiffs' bill, or that she ever lost the pretended note set up in said bill. They aver that what gave rise to said pretended claim was the fact that previous to the marriage of said Lucinda with said Board her said grandfather offered to give

her his note for $1,500.00 if she would abandon the idea of having anything to do with said Board, which she refused to accept, giving her grandfather an insulting reply, declaring she would marry whom she pleased; that said William W. R. Callihan lived in the county of Barbour aforesaid for ten years after the war, and no one ever heard tell of a lost note of the kind claimed by the plaintiffs, and no intimation of the kind was ever made to said William W. R. Callihan, or any other person, during said ten years, by the said Board and wife, that said bond was lost. They admit that a judgment was obtained against the administrator of the estate of said William W. R. Callihan in the Circuit Court of Barbour county for the amount of said pretended note and costs, but claim that it was obtained through perjury and fraud. They admit that said William W. R. Callihan, a short time before his death, made his will, a copy of which appears in the record, in which no allusion was made to the said pretended note of the said Lucinda, or any arrangement by which it could possibly be paid, except by deranging everything which he had in his mature moments settled and arranged according to his wishes. They aver that there is no estate in the hands of the administrator of said William W. R. Callihan out of which said judgment can be paid, and nothing remaining belonging to the estate of the said William W. R. Callihan to be administered upon to pay said judgment, and the same can not be paid without subjecting the property disposed of by him in his life-time by deeds and by his last will.

Upon this state of pleadings, and after the depositions of Samuel Crislip, David Boylen, and John R. Brown had been taken, a decree was entered in said cause on the 1st day of November, 1883, directing Lair D. Morrall, a commissioner of the court, to audit, state, settle and report the administration account of John Callihan, administrator with the will annexed of W. W. R. Callihan, deceased, and to ascertain and report the real estate owned by said W. W. R. Callihan at the time of his death, the amount and character thereof, the title thereto, the liens thereon, the amount, character, and priorities of the debts, and to whom owing; to take proof of and report the amount of the plaintiffs'

debt, and upon what real and personal estate of William W. R. Callihan in the hands of his heirs and administrator or devisees the same is chargeable; and to take proof and report all outstanding debts chargeable upon said real and personal estate, *etc.*

On the 14th day of March, 1887, another decree was rendered in said cause passing upon certain exceptions to the report of said Commissioner Morrall, filed therein on the 28th day of February, 1887, and recommitting the cause for the same purpose to said commissioner, with instruction to reform and restate said report in conformity with the opinion of the court, as therein expressed upon said exceptions, and in conformity with the law and the evidence before him; and said commissioner was directed to give notice to the parties to the suit of the execution of said order.

On the 18th day of July, 1887, said court entered another decree, reciting that said commissioner had returned his second report in the cause, and, the defendants having filed certain exceptions thereto, the court, without passing upon said report or exceptions, again recommitted said report to said commissioner, directing him, without further notice, to re-state and re-form his reports theretofore made, and to report any other outstanding debts or charges against the estate of William W. R. Callihan.

On the 20th day of October, 1887, the plaintiffs filed certain exceptions to the report of said commissioner, whereof the court took time to consider; and on the 24th day of July, 1888, the cause came on to be heard finally, and the court decreed specifically that the said W. W. R. Callihan in his life-time, to wit, on the ——— day of June, 1855, executed and delivered to the female plaintiff his writing obligatory or single bill for $1,500.00, dated as aforesaid, payable at the death of said William W. R. Callihan, with interest from the date thereof; and that the said plaintiffs, to establish the existence of the same against the decedent, William W. R. Callihan, instituted their action at law against the administrator of said Callihan, and recovered judgment against him thereon for said $1,500.00, with interest, and $242.60 costs; and that said $1,500.00, and the interest accruing thereon, together with said costs, consti-

tute a proper charge against the estate of said William W.
R. Callihan in the hands of his said administrator, heirs,
devisees, and voluntary alienees; but that the said single
bill was a voluntary obligation, and should be postponed to
the payment of all other debts thereinafter named, except
the legacy chargeable upon the land devised to the defend-
ant James P. Callihan; also finding that the said William
W. R. Callihan departed this life on the 10th day of Decem-
ber, 1874, after having made and delivered five conveyances
subsequent to the creation of the plaintiffs' debt, and which,
as to said debt, and other *bona fide* debts of said William W.
R. Callihan therein decreed for, were adjudged voluntary
and fraudulent—the conveyances referred to being a deed
to his son, the defendant John Callihan, on the 6th day of
September, 1858, for five ninths of 300 acres of land; also
a deed to said John Callihan on the 12th day of December,
1873, for 122 acres; also a deed to Charles Callihan, on the
same day, for 274 acres; a deed to James Stuart, trustee for
his grandson William F. Callihan, and his wife, Penelope
Callihan, and the surviving children of the body of the said
William F. Callihan, on the same day, for sixty four acres;
and a deed to his son John Callihan, on the 24th day
of September, 1874, for 211 acres; also proceeded to pass
upon the matters contained in the reports of said commis-
sioner, the exceptions thereto by the plaintiffs and defend-
ants, and the proofs and depositions filed as part of said re-
port, and exceptions indorsed on said depositions by plain-
tiffs, sustained the exceptions endorsed by plaintiffs, and
ascertained that there is of personal assets in the hands of
said administrator $226.15, with interest thereon from the
15th day of February, 1857.

The exceptions to the commissioner's report refer mainly
to the settlement of the administration account of John Cal-
lihan, administrator of the estate of William W. R. Calli-
han, deceased, and to debts and claims against said estate
allowed by said commissioner; but the material question
raised thereby is as to the propriety of the action of said
court in overruling the first exception to the third report of
Commissioner Morrall, which is in these words: "Because
he sustains and reports, as a valid debt against his dece-
dent's estate, the pretended debt of plaintiffs."

After disposing of said exceptions said Circuit Court proceeded to ascertain the indebtedness of said estate; finding, among other things, that the amount due the plaintiff Lucinda Board was $4,513.85 (being the amount of her said debt of $1,500.00, and interest thereon from the 30th of June, 1855,) with interest thereon from the 16th day of February, 1887, until paid, and ascertaining that said indebtedness was chargeable first upon the said 116 acres, devised to James P. Callihan; and that the residue of said debts, if any remain unpaid after said 116 acres is exhausted, should be charged ratably according to the values thereof upon the lands conveyed to John Callihan, Charles S. Callihan and James Stuart, trustee, etc., remaining unsold in the hands of said grantees, and upon the proceeds arising from the sales of any of said grantees, or any of them; and it appearing that Charles S. Callihan had sold and conveyed said 274 acre tract, and John Callihan had also conveyed said 122 (or ninety seven and one half acres) and that both of said tracts were by said conveyances placed beyond the control of the court, it was accordingly decreed that there was a liability upon the said Charles S. Callihan and John Callihan, individually; and also upon the said 211 acres of land conveyed to John Callihan, and sixty four acres conveyed to James Stuart, trustee, for their ratable proportions of the residue of said debts remaining unpaid after the proceeds of the sale of the 116 acres was exhausted, and appointed a special commissioner to advertise and sell said 116 acre tract in the manner and upon the terms therein directed. From this decree said John Callihan as administrator, etc., obtained this appeal.

The plaintiffs George W. and Lucinda Board brought this suit for the purpose of collecting from the estate of William W. R. Callihan the claim for $1,500.00, with interest thereon from June 1855, and the settlement of the account of John Callihan administrator of said estate is merely a consequence resulting from the proceedings inaugurated to enforce said collection against said estate, and the question of vital importance to the proper determination of this case is raised by the appellant's *twelfth* assignment of error which claims that "it was error to sustain the plaintiff's alleged debt as a valid

one and charge against said estate." By the decree directing an account in this cause on the 1st day of November, 1883, the commissioner was directed "to take proof of and report the amount of the plaintiff's debt and upon what real and personal estate of William W. R. Callihan in the hands of the said administrator or heirs and devisees the same is chargeable" not as to whether the debt existed or was a valid debt and chargeable against the estate real and personal of William W. R. Callihan deceased. The existence of the debt was treated by the Court as something already established or conceded when by the pleadings in the cause the existence of said debt is utterly denied and the issue upon that point is the chief question of controversy in the case.

In response to the requirement in said decree the commissioner reported in his first report as follows: "A judgment rendered in the Circuit Court of Barbour in favor of George W. Board and Lucinda Board *v.* John Callihan, administrator of William W. R. Callihan, deceased, at the Fall term 1879, of the Circuit Court of Barbour county, with interest from the 13th day of November, 1879, and $242.60 costs which judgment was founded upon an obligation of $1,500.00, executed by said testator to the said Lucinda Board in his life about the —— day of June, 1855, with interest from date, which report was excepted to and the exception sustained as to said item. And in his second report he reported a debt in favor of Lucinda Board against said William W. R. Callihan evidenced by a note or single bill, according to proof executed by said William W. R. Callihan to the said Lucinda Board on the —— of June, 1855, for the sum of $1,500.00. Total face and interest $4,271.25 and in his third report said commissioner while he admits the testimony is somewhat conflicting as it regards the time said debt of Lucinda Board should bear interest he concludes not to change his former report in regard to said debt and interest and leaves the question to the decision of the Court. This report is excepted to by the administrator of said estate because he reports as a valid debt against his decedents estate the pretended debt of plaintiff, which exception was overruled by the Court.

It will be perceived by reference to the order directing the

account to be taken and reported by said commissioner that he was not required to report upon the validity of the debt claimed by plaintiffs but he was required to report the amount of the same, and while it is true that this Court has held in case of *Handy* v. *Scott Baker & Co. et al.* 26 W. Va. R. 710, "where questions purely of fact are referred to a commissioner to be reported upon, the findings of the commissioner while not as conclusive as the verdict of a jury, will be given great weight, and should be sustained unless it plainly appears that they are not warranted by any reasonable view of the evidence. This rule operates with peculiar force in an appellate court, where the findings of the commissioner have been approved and sustained by the decree of the inferior court." *Boyd* v. *Garrison*, 14 W. Va. 1–19. *Graham* v. *Graham*, 21 Id. 698. Yet when a commissioner who as in this case was directed to ascertain the amount of a certain debt goes beyond the requirements of the decree and reports the debt referred to as an outstanding debt against the real and personal estate of said testator and that it should be paid *pro rata* out of the personal estate in the hands of the administrator to be administered *etc.*, he thus reports upon the dignity and validity of the debt, a question which was not referred to him, a question of law and fact and the rulings of this Court in the cases last above referred to and other similar cases would have no application.

The question to be determined in this case is as to the correctness of the decision of the court below in holding that Wm. W. R. Callihan executed and delivered to the plaintiff, Lucinda, his obligation under seal in June, 1855, for the payment of $1,500.00, after his death with interest from date. Has this fact been proven by competent testimony?

Now in the answer of Charles S. Callihan, and John Callihan, admistrator, to the plaintiff's bill we find this language: "It is utterly untrue that the said Wm. W. R. Callihan made and delivered to the said Lucinda, the female plaintiff, the bond or obligation for $1,500.00, as described in complainant's bill, and it is untrue that the said Lucinda ever lost the pretended note set up in the bill of complaint."

In Greenleaf on Evidence, vol. 1, sec. 88, 14th edition, the author says: "In the third place, oral evidence can not be

substituted for any writing, the existence of which is disputed, and which is material either to the issue between the parties or to the credit of witnesses and is not merely the memorandum of some other fact. For by applying the rule to such cases the court acquires a knowledge of the whole contents of the instrument, which may have a different effect from the statement of a part." "I have always" said Lord TENTERDEN "acted most strictly on the rule that what is in writing shall only be proved by the writing itself. My experience has taught me the extreme danger of relying on the recollection of witnesses, however honest, as to the contents of written instruments; they may be so easily mistaken that I think the purposes of justice require the strict enforcement of the rule," and although it does not appear that counsel for the defence in the court below objected to proof of the contents of the obligation claimed by the plaintiff, Lucinda Board, to have been executed to her by her grandfather Wm. W. R. Callihan, yet if an illustration was wanting of the wisdom of the rule adopted by Lord TENTERDEN none better could be afforded, than the evidence which was allowed, to be introduced in this case as to the contents and character of said obligation. Three witnesses profess to have seen this obligation in the possession of said Lucinda, Samuel Chrislip a brother-in-law of the plaintiff G. W. Board, whose deposition was taken on the 21st day of October, 1880, states that the plaintiffs were married in the year 1857, and lived at his house for six or seven months after their marriage, that two or three weeks before their marriage said Lucinda was up at his house and James D. Hall sent a note with her to him in regard to the purchase of some cattle, and in getting the note out she pulled out a note Callihan had given her, he supposed through mistake and he took it and read it; that was in the year 1857; said note called for $1,500.00. Said note was dated in the year 1855 and was made payable after Wm. W. R. Callihan's death, it bore interest from date, he read said note carefully. Said note read, "For value received I promise to pay Lucinda Callihan fifteen hundred dollars and bind myself, my heirs and executors as witness my hand and seal," and I think as well as I now recollect it said payable after his death, yes that is certain; payable after his

death. At the time this witness professes to state the contents of this obligation he says he was eighty years of age, and when asked if he ever saw any note before 1857, answered "no," and when asked, "Did you ever see any other note except the note Lucinda Callihan had," answered : "I do not recollect of seeing any other," and then admitted in answer to the next question that he had executed notes to other persons himself but not of late years, and had had notes given him by other parties since that time but could not fix the dates, and when asked, "How many years ago was 1857," answered : "It has been several years ago. I believe it would work me up to count how many years."

In the case of *Apperson* v. *Dowdy*, 82 Virginia R. 779, where an attempt was made to prove the contents of a lost will by a witness over eighty years of age who professed to have heard the will read sixty eight years before, Judge LACY in delivering the opinion of the Court says : "For example, if perfect knowledge, a reasonable time, and a simple fact be the question, and the witness reasonably intelligent, the contents might be satisfactorily proved by the recollection of the witness. Thus an intelligent witness, called upon to prove the contents of a will recently read by the witness which devised a known tract of land to Peter Duncan would not risk the miscarriage of justice." But if the degree of intelligence of the witness is to be any criterion in estimating the weight of the testimony, what degree of importance can we attach to the testimony of Samuel Chrislip who appears to have detailed his evidence with a determination to know nothing about any other note, save the one in controversy, and to remember that, in its entire details although more than twenty three years had elapsed since he claims to have seen and read it.

The second witness on whom the plaintiffs rely to prove the contents of said obligation is Ephraim Welch, who states that he saw and read said note in April or May, 1857, when it was handed to his wife by the plaintiff Lucinda, who passed it to him and he read it. He states that "It was an old fashioned note with a scroll to it and 'witness my hand and seal,' " and was signed by Wm. W. R. Callihan, it was payable at the death of her grandfather and bore interest

"from date," he fixes the date at which he saw this note in the year 1857, by the birth of one of his children that was born in the preceding December, and when asked on cross-examination to state how said note read, answered: "It read a good deal like the note I draw up at this present day, 'For value received I promise to pay Lucinda Board $1,500.00 at my death,'" and when asked if he was sure that was the wording of it answered, "That is the way I read it," he is then asked, "Did you not state in the deposition taken in the law case that it read "For value received I promise and bind my heirs and assigns to pay at my death with interest from date the sum of $1,500.00," answered: "It said $1,500.00 with interest from date. That is the way I read the note and have it in my memory that it read that way. I read it and took it by the face of the note." When asked "Do you remember of telling Dr. Chas. S. Callihan on or about the 12th of September, 1875, at his home or office in Philippi that George W. Board was a dangerous man and to watch him and tell his father also; and did you not state to him that George W. Board was trying to procure witnesses to prove that Wm. W. R. Callihan had executed a note to his wife Lucinda, for $1,500.00 and he (Board) had offered half the judgment he might obtain for witnesses to prove it?" Answered: "I will just answer that in this way. No sir-ee bob," and on this point he is squarely contradicted by the deposition of said Chas. S. Callihan, and six of his neighbors testified that his reputation for truth and veracity was bad and they would not believe him on oath, although more than double that number testified that his reputation was good and they would believe him on oath, his testimony must at least be regarded with suspicion, and the circumstance that he is acquainted with the fact that the plaintiff G. W. Board, was in search of witnesses and offering half of the recovery if he could prove the execution and delivery of said note does not in any manner detract from the suspicion which should attach to his character.

The remaining witness who claims to have seen this note is Perry Green Crislip, who testified that in the summer of 1855, he thinks, in June, William W. R. Callihan, in his presence, gave to said Lucinda a note for $1,500.00,

payable at his death, and he believes he witnessed the note, that some six months after this at said Callihan's house, he heard a conversation between William W. R. Callihan and Lucinda to this effect: Callihan proposed to sell her fifty acres of land at $40.00 per acre, and take up the $1,500.00 note, and give to him her note for $500.00, which she declined, because she did not know where to raise the $500.00.

Now it is extremely difficult to reconcile this testimony with that of Johnson W. Crislip, who states that in the year 1856 said William W. R. Callihan sent by him his note for $1,500.00, to be presented to said Lucinda Callihan upon condition that she would have nothing more to say to said G. W. Board; that he did so present it, and informed her that her grandfather said that if she ever did have anything to do with said Board he would disinherit her and would never give her one cent; and she returned said note to witness, and sent an insulting message to her grandfather. This note was made payable some time after the death of said William W. R. Callihan, and witness returned the note to him and delivered her message, who took the note back, and said she should never have one cent of his estate without she did as he wanted her to. Is it at all probable that said William W. R. Callihan would, as Johnson W. Crislip swears, be presenting her a note for $1,500.00 in 1856, either conditional or unconditional, if she had already in her possession his note for $1,500.00, which Perry G. Crislip says he saw said William W. R. Callihan give her in the summer of 1855, when he took him two boxes of honey; and all of the plaintiffs' witnesses who speak of this note claim that it bore date in 1855, and carried interest from June, 1855. It is not claimed that said Callihan gave said Lucinda two notes for $1,500.00, yet we must believe that he offered her a second note for $1,500.00, if she would have nothing further to say to Board, if we reconcile the testimony of Perry Green Crislip with that of Johnson W. Crislip. This testimony does not accord well with the allegation of plaintiffs' bill; she therein avers in reference to the motives which prompted said Callihan to execute and deliver said note to her that "it was for the considerate purpose of aiding her in form · ing such alliance as would be suitable to the condition of his

family, which was the most wealthy and substantial in the county," when the evidence shows that he offered her said note upon condition that she would not marry this man Board, whom he disliked; and when P. G. Crislip was examined by the defendants, he states that said note did not bear interest according to his recollection, and it appeared to him there was some condition in the note that she was to marry as he wanted her. This testimony, to say the least of it, is too uncertain and indefinite to authorize a court to ascertain what the terms of this obligation were.

The evidence shows that said Lucinda married George W. Board in 1857, Johnson W. Crislip fixes the date at about the year 1856 when he tendered said note to said Lucinda upon condition that she would have nothing more to say to Board, which note she then indignantly refused and returned it to him, and said Callihan then remarked that she should never have one cent of his estate without she did as he wanted her to. Samuel Crislip states that he saw this note two or three weeks before the marriage of said Lucinda in her possession, but Mary Simon states in her deposition that "she had a conversation with said William W. R. Callihan shortly before said marriage, in which he said she was too young to marry and that if she had stayed with him until she became a woman's age that he would have made her a nice present, but that he did not know that he would give her anything now." Then the witness Worthinton Douglas states that George W. Board wanted him to swear that he knew of the note, and offered him a portion of the recovery if he was successful, and that he heard said Lucinda say that she thanked her grandpap for what he had done for her, that he had never given her the wrappings of her finger; and Celia Hickman, Jonathan Adams, and M. D. Reed all testify that they heard said Lucinda Board say in substance that she had received nothing that she knew of from her said grandfather. Alfred Armstrong states that he heard said William W. R. Callihan tell her that she should never have a cent as long as she lived, and E. D. Westfall saw him just after the marriage, he was very much enraged and said he had never given her anything and be d—d if he ever would, and while it is true that the witnesses

John R. Brown and Daniel Boylen, state that William W. R. Callihan said the female plaintiff was to have money from his estate; the former stating that said Callihan told him in 1858 or 1859, that he had given G. W. Board's wife a note for about $1,500.00, which was not to be paid during his life; the latter stating that said Callihan informed him that the female plaintiff would be able some day to pay for the Charles Nutter farm with $1,500.00 or $2,000.00 as he had arranged that she was to have money from his estate, and Austin Reeder also states that on the 29th of March, 1874, said William W. R. Callihan told him he had already made provisions for said Board's wife, that she was to have $1,500.00, or get it; yet these statements are met by her own declarations to Celia Hickman, Jonathan Adams, Penelope J. Callihan and M. D. Reed, that her grandfather had left her nothing. Another circumstance which indicates that the plaintiffs did not at first intend to assert this claim, is that it appears that on the 5th day of January, 1876, said G. W. Board sued the administrator of said William W. R. Callihan on a small account for potatoes and produce in the County Court of Barbour, four years before this suit was brought, and it would be reasonable to suppose that if the plaintiffs had this large claim they would not have delayed its assertion for six years after the death of said William W. R. Callihan.

In Parsons on Contracts, Vol. 1, p. 234, the author says: "It is essential to a gift that it goes into effect at once, and completely. If it regards the future it is but a promise, and being a promise without consideration it can not be enforced, and has no legal validity."

Hence delivery is essential to the validity of every gift: Now in this case the delivery of this obligation to the female plaintiff in the year 1855, by said William W. R. Callihan is alleged in the bill and denied in the answer, and the only witness who pretends to prove said delivery is P. G. Crislip and he fixes the date of said delivery in June, 1855, and says he believes he witnessed the note. But how can we give credence to this statement, when he is again called as a witness and states that "it appears to him there was a condition in said note that she was to marry as he wanted her,

but he can not recollect positive," and also stated that said note did not bear interest, although in his first deposition he had left the impression that said note was unconditional and bore interest—and when asked if he did not state at the trial of the law case on cross-examination that there was no condition to said note, or words to that effect, he denied it, and one of the counsel who first introduced him as a witness was called as a witness and contradicted his statement. And again if the statement of P. G. Crislip as to the delivery of said obligation was true, why was said Callihan again sending her his obligation for $1,500.00 in 1856 by Johnson W. Crislip, to be delivered to her if she would have nothing farther to say to George W. Board, and would said Lucinda herself have been repeatedly declaring that her grandfather had given her nothing that she knew of, if she had this obligation for $1,500.00 in her possession bearing interest; and the loss is alleged in the bill and squarely denied and no witness proves the loss.

In the case of *Seabright* v. *Seabright*, 28 W. Va. 483, in which the question was whether notes amounting in value to $22,000.00, had been given by Louis Seabright shortly before his death to his two half brothers. GREEN, Judge, in delivering the opinion of the Court says: "the delivery of the possession to the donee to perfect a gift *inter vivos* is necessary; but the Courts require less stringent proof of delivery to establish such gifts than to establish gifts *causa mortis* as there is usually less opportunity to set up a fraudulent pretence, of a gift *inter vivos* than of a gift *causa mortis*.''

In the case of *Conklin* v. *Conklin*, 27 N. Y. (20 Hun 279) the court quotes with approval from the case of *Contant* v. *Schuyler*, 1 Paige, 316, the following language: " It is clear that if I own a chattel, not a chose in action, to-day, and next week it is found in another's possession, the law does not presume a legal transfer of the title to the possessor. But as against me, if title be claimed, he must prove it. Why should any different rule prevail as to a promissory note?" But if any presumption of title prevail by mere possession, it is only where the possession is free from suspicion. The learned Judge says: "We concur in the good sense of these observations, for we think nothing would

be more injurious to the administration of the law than to permit the mere fact of possession of property shown to have belonged to a deceased person a few days before his death by relatives, or persons residing in the same family and having access thereto, to be satisfactory or even *prima facie* evidence of title." Is the evidence of P. G. Crislip free from suspicion? He says " he was at James D. Halls' in June, 1855, having brought him two boxes of honey. William W. R. Callihan was there, and in my presence gave to Lucinda Callihan a note for the sum of $1,500.00, payable at his death; he believes he witnessed it." What need was there for a witness? He don't say he read it, but he does say in his second deposition that it did not bear interest, and that there was a condition in it that she was to marry as he wanted her. If he proves anything he proves too much for the plaintiffs, and they feel called upon to place their attorney in this case and the law case on the stand to contradict him.

It seems to me that the proof in the cause is not sufficient to show that any note or bond was ever delivered by said William W. R. Callihan to the plaintiff Lucinda Board, or if so executed and delivered, the circumstances tend to show that it was coupled with the condition that she was not to marry the plaintiff G. W. Board.

But if the proof was sufficient to establish the delivery of said bond, does the evidence establish the terms of the contract with that certainty and definiteness that would enable the Court to specifically enforce it against the estate of said William W. R. Callihan.

P. G. Crislip, the only witness that pretends to prove the delivery of said obligation, says it did not bear interest, and Samuel Crislip, who claims to have read the note, says that it did. P. G. Crislip also says that " it appears to me there was some condition in said note that she was to marry as he wanted her," and that he was the subscribing witness. It can not be that a Court of Equity will enforce a contract proven, as this one was, against the estate of a dead man.

But if this paper was executed and delivered, and we adopt either the version of its contents given by Samuel Crislip or P. G. Crislip, can it be regarded otherwise than simply a testamentary paper, and as such inoperative?

In the case of *Habergram* v. *Vincent*, 2.1 Ves. Jr., 204, it is held that an instrument in any form, whether deed, poll or indenture, if the obvious purpose is not to take place till after the decease of the person making it, the same shall operate as a will.

In the case of *Masterman* v. *Naberly*, 2 Hagg. 235, the Court held that "when a paper is not intended as a will, but as an instrument of a different nature, if it can not operate in the latter it may in the former character, for the form does not effect its title to probate, provided it is to carry into effect the intention of the deceased after his death.

*In re Knight*, 2 Hagg. 211, the court probated a deed testamentary in its whole purport and effect and not to operate till after death.

In the case of *Frew* v. *Clarke*, 80 Pa. St. 170, the following paper was held to be testamentary : "Know all men by these presents that I, James McCally   *   *   .*   do order and direct my administrators or executors, in case of my death to pay to Robert D. Clarke the sum of $75,000.00 as a token of my regard for him and to commemorate the long friendship existing between us, witness my hand and seal this 17th day of April, A. D. 1872. JAMES McCALLY, [seal.]"

An instrument in any form if the obvious purpose is to take place after the death of the person making it operates as a will.

In the case of *Hunt* v. *Hunt*, 4 N. H. 433, it is held, when the payee of a note wrote upon the back of it as follows : "If I am not living at the time this note is paid I order the contents to be paid to A. H.," and having signed it, afterwards died before the same was paid, it was held that the endorsement was testamentary and entitled to probate as a will.

In *Jackson* v. *Jackson*, 6 Dana 258, the Court held, "that the form of a will of personalty is not material, any writing which shows that the maker's intention that the whole or a part of his effects shall pass at his death to a designated individual or person, may, it seems, be sustained as testamentary provision."

"2. A court of chancery will take jurisdiction of a case upon a lost writing, but very clear proof of its execution and con-

tents is required," and in the case of *Corer* v. *Stern, Ex'r,* 67 Md. 449, an instrument in the following form was made and delivered to the person therein named.

"Md. September 4, 1884.

"At my death, my estate or my executor pay to July Ann Corer three thousand dollars.

Witness :                                    DAVID ENGLE, of P. [seal.]

COLUMBUS CORER."

In an action of debt on this instrument as a writing obligatory, after the death of the maker against his executor it was held "that it was a testamentary paper and no recovery could be had thereon."

From these authorities I can arrive at no other conclusion than that the said paper, if ever delivered, could not be enforced against the estate of said Callihan, not only on account of the indefiniteness and uncertainty as to its character and contents, but because it must be regarded as a testamentary paper, which has not been properly proven, and again if said obligation was valid and its execution and delivery satisfactorily established, it could not be satisfied out of the lands conveyed away by said Callihan in his lifetime, because the suit was not instituted for more than five years after the death of said Callihan, and even if said conveyances were voluntary, said land could not be subjected after the lapse of five years.

Again this Court has held in the case of *Bank* v. *Good,* 21 W. Va. 455: " A judgment against the personal representative of an estate is not even *prima facie,* much less conclusive evidence against the devisee or heir of such estate; and the fact that the same person may be both personal representative and heir or devisee, does not constitute an exception to the rule."

Also in *Sadler's Adm'r* v. *Kennedy's Adm'r, et al.,* 26 W. Va. 636, the same ruling is found, and in that case this Court also holds that in a suit brought on such a judgment to subject the real assets descended, such judgment against the personal representative will not prevent the heirs from relying on the statute of limitations as a bar to the original cause of action in said suit. Yet the Circuit Court in this cause in its decree, after setting forth that the plaintiffs had

recovered judgment against the administrator of the estate of said William W. R. Callihan for $1,500.00, with interest, and $242.60 costs, decreed that said sum of $1,500.00, and the interest accruing thereon, together with said costs, constituted a proper charge against the estate of said William W. R. Callihan, in the hands of his administrator, heirs, devisees and voluntary alienees, and proceeded to declare the conveyances hereinbefore mentioned as made by said William W. R. Callihan in his life time, fraudulent and void as to said debt, and to direct a sale of said 116 acre tract. It is clear that the court below erred in holding said real estate chargeable with said sum of $1,500.00, with its accrued interest and costs, and that the same or any portion of it can be subjected to the payment thereof, and having arrived at this conclusion it renders it unnecessary to pass upon the questions raised in the assignment of errors as to want of necessary parties; although I may say that all persons interested in said real estate were necessary parties to a suit brought to sell the same.

The decree complained of must be reversed, and the cause must be remanded to the Circuit Court of Barbour county for further proceedings to be had therein in accordance with the principles announced in this opinion and the rules of equity, and the appellant must recover the costs of this appeal.

REVERSED. REMANDED.