# CHARLESTON

## Freeman v. Freeman.

Submitted June 9, 1911.   Decided November 19, 1912.

1.  WILLS—*Execution—Subscribing Witness.*

    It is not necessary that subscribing witnesses should know the contents of the will, or that the testator should tell them that the paper is his will. If they are called to witness his signature to a paper, and do so in his presence and in the presence of each other, after reading the attestation clause appended thereto, which states that it is the will of the party whose signature they are called upon to witness, it is a sufficient attestation; and proof of these facts establishes the due execution of the will.   (p. 305).

2.  SAME—*Execution—Proof.*

    The law requires a will, not wholly in the handwriting of the testator, to be subscribed by two witnesses; but the rules of evidence do not require its due execution to be proven by the two subscribing witnesses, although their testimony is generally the best evidence of the fact.   (p. 305).

3.  WITNESSES—*Husband and Wife—Competency.*

    If a husband or wife is incompetent, by virtue of sec. 23, ch. 130, Code (1906), to testify to personal transactions or communications had between the witness and a decedent, the other consort is also incompetent.   (p. 306).

4.  SAME—*Competency—Mental Capacity of Testator—Husband of Heir.*

    The husband of an heir who is contesting the will, is incompetent to testify to the mental incapacity of testator.   (p. 306).

5.  SAME—*Transactions with Persons Since Deceased—"Personal Transactions or Communications."*

    The words "personal transactions or communications," within the meaning of sec. 23, ch. 130, Code, include every method whereby one person may derive impressions or information from the conduct, condition or language of another.   (p. 308).

6.  EVIDENCE—*Mental Capacity—Non-Expert.*

    A non-expert witness is competent to give his opinion in regard to the mental capacity or incapacity of a testator, based upon facts obtained by personal contact with him, and observations of his conduct and manner.   (p. 310).

7.  SAME—*Weight—Opinion of Non-experts.*

    The jury must determine the value of such opinion from the

opportunity which the witness is shown to have had to know
the testator and to observe his conduct.   (p. 311).

8.   WILLS—*Testamentary   Capacity—Knowledge   of   Property—
     Beneficiaries.*
         It is not necessary that a testator should know every item
     of his property or the value of his estate, to render him com-
     petent to dispose of it; it is sufficient if he knows of what it
     consists and knows the persons to whom he desires to give it.
     (p. 313).

9.   SAME—*Frauds—Inferences.*
         Fraud will not be inferred from facts and circumstances
     which are consistent with fair dealing; to establish fraud
     there must be positive proof of it, either direct or circum-
     stantial.   (p. 312).

10.  APPEAL AND ERROR—*Instructions—Time.*
         It is not reversible error for the trial court to give a written
     instruction to the jury, at their request, which correctly pro-
     pounds the law, after the case has been submitted to them and
     they have deliberated on it for a time.   (p. 313).

Error to Circuit Court, Mercer County.

Action by Lizzie Freeman against Ernest W. Freeman and
others.   Judgment for plaintiff, and defendants brings error.

*Affirmed.*

*Williams & Williams, D. E. French,* and *William E. Chilton,*
for plaintiffs in error.

*Hale & Pendleton, John M. McGrath,* and *Sanders &
Crockett,* for defendant in error.

WILLIAMS, JUDGE:

R. E. Freeman died in June, 1905, leaving a will by which
he disposed of the whole of his large estate to two brothers, C.
W. and W. G. Freeman, and to a cousin, E. W. Freeman.   He
had no children, but he left a widow, two sisters, a number of
sisters of the half blood, and children of a deceased brother,
also of the half blood, who are contesting his will.   This suit
was originally brought by the widow, Lizzie Freeman, for whom
testator made no provision whatever in his will.   The court
below denied her right to contest the will; and, from the order
of the circuit court of Mercer county dismissing her appeal
from the order of probate made in the county court, she ap-
pealed to this Court.   That appeal resulted in a reversal of the

lower court, this Court holding that, there being no provision made for her in the will and, therefore, nothing for her to renounce, under the statute, she could contest the will. The cause was remanded. The opinion in that case is reported in volume 61 at page 82 of the West Virginia Reports. After the cause was remanded a compromise agreement was made between the widow and the proponents of the will, whereby she was paid $150,000 in consideration of her distributive share in her husband's estate; and she ceased to prosecute her suit further. Thereupon the heirs-at-law of R. E. Freeman were made plaintiffs, and were permitted to proceed with the contest. Upon an issue of *devisavit vel non* a verdict was rendered holding the will which had been probated in the county court to be the true last will and testament of R. E. Freeman. The contestants moved the court to set the verdict aside, and the court took the motion under consideration until the next term; and on the 28th of August, 1909, overruled the motion, and entered judgment of probate. From that judgment contestants have obtained this writ of error.

During the trial a number of exceptions were taken to the rulings of the court, refusing to admit certain testimony of contestants' witnesses, and admitting, over their objection, certain testimony of proponents' witnesses. Many witnesses were examined pro and con, and the testimony is voluminous. It relates chiefly to the question of testator's mental capacity to make a will, and to the question whether or not it was procured to be made by undue influence.

The first point made is, that the evidence does not prove the will to have been duly executed. We think the evidence is sufficient on this point. The two subscribing witnesses, R. B. Smith and E. H. Witten, both testified for the proponents. Smith says: "He (meaning testator) asked me to witness his signature to his will." Witten does not say that he was asked to witness his will; but says he was asked by R. E. Freeman to witness his signature, and that he did so; that he did not read the will, but did read the attestation clause, which is in the usual form and recites all the facts necessary to show the signing and witnessing of the will in the manner required by law. The reading of the attestation clause informed him that he was

witnessing a will. It is not necessary that the subscribing witnesses to a will should know its contents; it was only necessary for the attesting witnesses in this case to know that they were witnessing the signature of R. E. Freeman to his will; and their testimony proves that they knew that. Their testimony also proves that they and the testator were all three together when he signed it, and they witnessed it. It, therefore, appears that all legal requirements were fully complied with, so far as the formal execution of the will is concerned. The law requires a will, not wholly written by the testator, to be attested by two subscribing witnesses; but there is no rule of evidence requiring it to be proven by the two attesting witnesses. In *Webb* v. *Dye*, 18· W. Va. 376. (syl. pt. 4) it was held: "A will must be subscribed but need not be proven by two attesting witnesses." To the same effect also is the holding in *Jesse* v. *Parker, Adm'r.*, 6 Grat. 57.

In *Savage* v. *Bowen,* 103 Va. 540, the court says: "It is not necessary that the attesting witnesses to a will should have been expressly requested by the testator to act in that capacity. The request may be implied from the surrounding facts and circumstances. Neither is it necessary that the request to attest should have been made at any time prior to the act of attestation. It may have been made at the time the will was being subscribed, as well as before, or the testator may acquiesce in and ratify the act of attestation at the time it is done."

The court rejected the testimony of C. H. F. Scott and S. A. Toy, husbands, respectively, of Barbara Scott and Caroline Toy, two of the contestants. They were offered as non-expert witnesses, to prove the mental incapacity of the testator, and .were shown to have knowledge of sufficient facts and circumstances to entitle them to give their opinions as to the sanity, or mental capacity, of testator, if they had been otherwise competent. It was also shown that, if they had been permitted to testify, they would have stated that, in their opinions, he was not, at the date of the execution of the will, mentally capable of making a will. Counsel insist that, although the wife is excluded from testifying because of her being a party to the suit or interested in the result of it, the husband may, nevertheless, testify in respect to the matters concerning which the law forbids her to speak;

and they cite the following cases to sustain the contention: *Hudkins* v. *Crim,* 64 W. Va. 225; *Weese* v. *Yokum,* 62 W. Va. 550; *Hollen* v. *Crim,* 62 W. Va. 451; and *Sayre* v. *Woodyard,* 66 W. Va. 288. But we do not so interpret sections 22 and 23 of chapter 130 of the Code (1906). Only one of the above cases, in any measure, supports the contention of counsel. It does appear that in *Hudkins* v. *Crim* the Court held that a husband may testify in respect to a matter as to which the wife could not have testified, because of her interest in the result of the suit. The right of the husband to testify was based upon his having no interest in the wife's property there involved, and which would have been saved to her in the event Hudkins had prevailed in his contention. The effect of the marital relation and the importance to be given to it in construing the statute seems not to have been called to the attention of the court, and it is not discussed in the opinion. The fact that Hudkins had been allowed to testify was not a turning point in that case, as the court held his testimony to be of little importance. If the court's attention had been called to the case of *Kilgore's Adm'r.* v. *Hanley,* 27 W. Va. 451, that case would no doubt have been followed, and Hudkins would have been held to be an incompetent witness; because it was clearly not the purpose of the court to overrule that case; no mention is made of it. But even if Hudkins had been held to be an incompetent witness the court's judgment would have been the same as it was in that case.

In *Kilgore's Adm'r.* v. *Hanley, supra,* it was expressly held that the wife of the defendant was an incompetent witness, against the administrator, to prove a personal transaction or communication had personally between herself or her husband in her presence, and the deceased. That decision was based, not upon the interest of the wife in the claim of the husband to be determined by the suit, but upon the common law doctrine of the unity of husband and wife and the identity of their interests, and upon the policy of the law to preserve this doctrine for the safeguarding of the marital relation. The following proposition is clearly deducible from the decision of that case, viz.: That, if one consort is forbidden by section 23, chapter 130, Code, to give testimony in regard to a personal trans-

action or communication had with a decedent, because of his or her being a party to, or interested in, the result of the suit, the other consort is also denied the right to testify. The denial of the right rests on two grounds, viz.: (1), if the testimony offered would be in favor of the other consort, it is excluded on the ground of identity of interest of husband and wife; and (2), if the testimony is adverse to the interest of the other consort, it is excluded on the ground of public policy. It would certainly not be conducive to domestic happiness and concord to permit one consort to testify against the interest and the will of the other.

The other cases relied on by counsel for contestants are not in point. *Hollen* v. *Crim, supra,* involved the right of a son, who was not a party to the suit, to give testimony concerning a personal transaction between his father and a deceased person. *Weese* v. *Yokum, supra,* presented the same question. *Sayre* v. *Woodyard, supra,* decided the question of the right of the maker of a note, in an action by the assignee against the administrator of assignor, to prove the assignment and payment to the assignor as agent of the payee.

The next question is, did the excluded testimony relate to a personal transaction between the witness and deceased? Was his testimony concerning the mental condition of testator, a personal transaction or communication had with him in his lifetime, within the meaning of section 23, chapter 130, Code? We think it was. In *Anderson* v. *Cranmer,* 11 W. Va. 562, which was a suit brought by the heirs of a decedent to avoid a trust deed made by him in his lifetime, on the ground of his insanity at the time of its execution, the trustee and *cestui que trust* were offered as witnesses, to prove that they were present at the time of the execution of the deed, and that, in their opinion, based upon the conduct and conversations of deceased at the time, he was sane; and it was held that they were incompetent witnesses, because their opinions were formed from facts which were personal transactions and communications within the meaning of the statute.

In *Trowbridge* v. *Stone's Adm'r.,* 42 W. Va. 454, a suit by M. J. Trowbridge, a person of unsound mind, brought by her next friend against the administrator of her deceased com-

mittee, to surcharge and falsify the settlement of said committee's account which had been made and confirmed under chapter 87 of the Code, the children of the deceased committee were offered as witnesses to prove that they had observed and knew the physical condition of plaintiff, the amount and value of the services performed by her for her committee, and that she was too weak, both mentally and physically, to perform work of any value. Their testimony was rejected, and on appeal, this Court held that it was properly rejected on ground of incompetency of the witnesses, because, as the Court said, such testimony necessarily related to "transactions or communications of the insane plaintiff in which these witnesses were interested against her to some extent and in some way participated, within the meaning and policy of the statute excluding them."

In construing a statute similar to our own, the court of appeals of New York, in *Holcomb* v. *Holcomb,* 95 N. Y. 316, excluded the testimony of an interested witness in relation to the conduct and actions of the deceased, tending to show his enfeebled and dependent condition, and also excluded evidence of statements made by deceased in the hearing of the witness, although not addressed to him, and made in ignorance of his presence. The court further held that: "The words 'transactions or communications' (used in the statute) include every method by which one person can derive any impression or information from the conduct, condition or language of another."

The purpose of section 23, chapter 130, Code, is to prevent a person having an interest to be affected by the suit from giving testimony concerning the words, or actions of a decedent, which he, if living, could contradict, against those who claim under the decedent. Death having sealed the lips of one, the law closes the mouth of the other. Therefore, the words "transactions or communications," as used in the statute, should be given a liberal construction. To limit their meaning so as to include only individual conversations and direct personal dealings between the witness and deceased, would be too narrow a construction, and would result in defeating the purpose of the statute in many cases. The words of the statute include personal contact with, and observations of, deceased's conduct, up-

on which an opinion of his mental condition could be formed. The opinion of a non-expert could be formed in no other way.

"A 'transaction' within the meaning of the statutes under discussion is an action participated in by witness and decedent, or something done in decedent's presence, to which, if alive, he could testify of his personal knowledge, and the term embraces every variety of affairs, the subject of negotiations, actions, or contracts. It has also been said that personal 'transactions' and 'communications' with a person since deceased include every method by which one person can derive any impression or information from the conduct, condition, or language of another." 40 Cyc. 2314.

The question which we here have was expressly decided by this Court in *Kerr* v. *Lunsford,* 31 W. Va. 659, wherein it was held, (syl. pt. 4), that a person who would inherit a part of testator's property but for his will was incompetent to speak of the testator's capacity to make the will. In *Robin et al., Paupers,* v. *King,* 2 Leigh 140, which was a suit by slaves for their freedom, against one who claimed them by purchase from William King, then deceased, plaintiffs offered to prove by Catherine King, widow of William King, deceased, that she had often heard him say, in the presence of the family, that the mother of the slaves was an Indian woman, and the court held her incompetent to prove the declaration.

For a full discussion of the law respecting the right of the husband or wife to testify for or against each other, see Wigmore on Evidence, Vol. 1, sec. 600, and Vol. 2, sec. 2227.

It is insisted that the court erred in allowing non-expert witnesses to give their opinions in regard to the mental capacity of the testator at the time of making his will. Their opinions were based upon facts, more or less important, acquired by observation of deceased and by long acquaintance with him, and by the opportunity thus afforded of forming an opinion of his mental condition. Opinions, thus formed, by non-expert witnesses are clearly admissible.

In *Hopkins* v. *Wampler,* 108 Va. 705, the supreme court of appeals of Virginia says: "Non-expert witnesses may give their opinions upon the question of sanity of a testator when they state the facts and circumstances, within their personal knowl-

edge, upon which their opinions are based. Whether the witnesses have had sufficient opportunity of knowing and observing a testator to form a reliable opinion as to his mental condition affects the weight rather than the admissibility of their testimony."

In *Connecticut &c. Ins. Co.* v. *Lathrop*, 111 U. S. 612, which was an action upon a life insurance policy, it became material to know whether or not the insured, who took his own life, was sane or not when he did it, and the court held that the opinion of a non-professional witness as to the mental condition of the deceased, based upon facts and circumstances within his personal knowledge, was competent evidence.

Our own Court, in *Jarrett* v. *Jarrett,* 11 W. Va. 584, impliedly holds such evidence admissible. Point 10 of the syllabus in that case reads as follows: "The mere *opinions* of witnesses not experts are entitled to little or no regard, unless they are supported by good reasons founded on facts which warrant them; and if the reasons and facts upon which they are founded are frivilous, the *opinions* of such witnesses are worth but little or nothing."

The knowledge of facts and the opportunity which non-experts have of judging of the mental capacity or incapacity of the testator relates to the value or weight which the jury may give to their opinions, rather than to the admissibility of such evidence. *Hopkins* v. *Wampler, supra.*

In *Hiett* v. *Shull,* 36 W. Va. 563, it was held (syl. pt. 3), that: "The evidence of his neighbors of sound judgment and fair powers of observation, who have known him long and well, and who have had occasion to observe and test the vigor of his mental faculties, and who can give the facts upon which their impressions and opinions are based, is ordinarily the reliable evidence in such cases." Non-expert witnesses, of course, should not be permitted to give their opinions based upon knowledge of facts acquired from persons other than deceased. An opinion based upon knowledge acquired from persons, other than deceased, can only be given by experts or alienists. All the witnesses in this case, who gave their opinions as to the sanity of deceased, based them upon some fact or facts acquired by personal observation of, and association with, deceased; and it was the province

of the jury to give their opinions such weight as their oppor-
tunities to know deceased and to judge of his mental capacity,
entitled them to.  Many of them knew him intimately for many
years; others knew him for a shorter time and not so well.

Testator frequently used intoxicants excessively, and also, at
times, used opiates; three days before he made his will he had
executed to C. W. Freeman, his brother, a paper called a trust
deed, but which is more in the nature of a power of attorney
than a trust deed, whereby he placed in the hands of his brother
the control and management of his entire estate; sometime after
the making of his will he was taken to a sanitarium in Columbus,
Ohio, to be treated for the alcohol habit, and after remaining
there for sometime he took his own life; and when his will was
made, some of the legatees were present in the room with him.
From these facts and circumstances, it is argued by counsel for
proponents' that fraud and undue influence in procuring the
execution of the will is established.  But, like the question of
mental capacity, this was a fact which the jury had to decide.
It was one of the principal questions involved in the issue of
*devisavit vel non.*  In a number of cases recently decided by
this Court, deeds and wills have been assailed by similar evi-
dence, and in all of them it was held that such evidence was not
sufficient to establish fraud.  See *Woodville* v. *Woodville,* 63 W.
Va. 286; *Teter* v. *Teter,* 59 W. Va. 449; and *Black* v. *Post,* 67
W. Va. 286.  In the latter case it was held that: "Fraud will
not be inferred from proof of the mere opportunity to commit
it; there must be evidence of actual fraud; this evidence may be
either direct or circumstantial, and, if circumstantial, the facts
and circumstances relied on to establish fraud must be incon-
sistent with fair dealing."

No fact or circumstance proven in the present case can be
said to be inconsistent with fair dealing.  The evidence is not
of that character which necessarily establishes fraud.  The only
evidence on which the jury could have based their conclusion,
had they found that the execution of the will was fraudulently
procured, is proof of the mere opportunity to commit it, shown
by the fact that testator did not usually engage in large
business transactions on his own account, and by the further
fact that some of his brothers were present in the room with

him at the time he made his will. The presumption of law is that testator was not coerced, or unduly influenced; and there is no evidence to overcome this presumption. Moreover, Dr. Hale, who prepared the will, says he obtained the data whereby to draft it, from testator himself, on the 21st of November, the day on which the paper was executed by testator to his brother; he further says the will was executed as he had prepared it.

Counsel complain of the ruling of the court in excluding certain evidence offered by proponents, to show the great value of testator's estate. We do not see that this testimony was very material. We find, however, that later during the progress of the trial, certain witnesses were permitted to give their opinions at to the value of stocks in certain coal companies, owned by testator. This cures the error, if any, in previously ruling it out.

It is insisted that testator did not know the amount and value of his property. This must be inferred from the fact that other witnesses were unable to testify as to its value. But testator evidently knew the great bulk of his property consisted of shares of stock in certain coal companies; he laid the certificates before Dr. Hale on the 21st of November, three days before he made his will. It was not necessary that he should know the value of it. Many men of sane minds and large business capacity do not carry in their minds every item of their property, and often do not know the value of it. Sometimes the best of business men suffer financial loss in consequence of the lack of such knowledge. The jury certainly had before them sufficient evidence to warrant them in believing that testator knew the persons to whom he was leaving his large amount of property and that his will disposed of the whole of it. This is all that the law requires he should know. Testator was only twenty-six or twenty-seven years of age when he died, yet for some years previous to his death he was drawing almost a princely income from his property, and no doubt spent large portions of it in a reckless manner. Still, at the time of making his will, he had large sums of money deposited in banks to his credit.

The case was argued and submitted to the jury at 11:00 P. M. on the 28th of June, 1909, and the jury were sent to their

room; but, not agreeing, were sent for in a few minutes, and were adjourned over until the next morning; they labored on the case all that day and until a late hour in the night, being called into court and adjourned over for their meals. On the morning of the second day after the case had been submitted to them one of the jury said to the judge that if he would give to them "an additional instruction of his own on the question of the weight which should be given to non-expert witnesses as to the sanity or insanity of R. E. Freeman that then the jury might be able to agree." Whereupon the court gave the following instruction, viz.: "The Court instructs the jury that where there is a controversy as to the capacity or the capability of the testator to make a Will that the evidence of his neighbors, of sound judgment and fair powers of observation who have known him long and well and who have had occasion to observe and test the vigor of his mental faculties and who can give facts upon which their impressions and opinions are based, is ordinarily the reliable evidence in such cases. And the Court instructs the jury that in this case the weight to which the opinions of such witnesses as to the mental condition of R. E. Freeman at the time of the making of his Will are entitled, must be determined from the opportunity of such witnesses to observe his conduct and demeanor and the opinions of such witnesses as neighbors and associates of said R. E. Freeman and those who had social and business intercourse with him from his boyhood, and who have observed him in conversation, his conduct, his demeanor and his appearance from his early life, is competent evidence in determining whether or not the said R. E. Freeman at the time of the execution of his Will, had sufficient capacity to do so."

It is urged that the giving of this instruction is in violation of chapter 38, Acts 1907, and constitutes reversible error. We do not think so. There is clearly no error of law in the language of the instruction. It correctly propounds the rule in relation to the manner in which the jury must determine the value of non-expert opinion evidence, as to the capacity or incapacity of the testator. It gave the jury the correct rule by which they were to determine the value of such opinion evidence, but left the jury perfectly free to determine for themselves the weight or value which they would give to the opinion of any particular

witness. It was, therefore, no encroachment upon the province of the jury in respect to their right to determine the weight of oral evidence. No expert witness was examined to prove mental incapacity of the testator, but a number of non-experts gave it as their opinion, based on more or less extended acquaintance with testator, that he had not the mental capacity to make a will; and the question was one of fact for the jury to decide upon the conflicting opinions of the numerous non-expert witnesses.

Should a judgment be reversed solely because an instruction was given after the case had been argued and submitted to the jury, notwithstanding it states the law correctly? Speaking for myself, I think the statute goes very far towards encroaching upon the constitutional prerogative of the judiciary; and it has been very much criticised by the bar of the state. To reverse for such cause would be to deny the court the right to correct its own mistake of law, should it discover such mistake before verdict, by giving a proper instruction to the jury after the instructions prepared by counsel and by the court had been read to them. When this Court can see that a judgment rests on a verdict rendered according to both law and evidence, I do not think it ought to reverse it, simply because an instruction, correct in law, was not given in a particular order. It would certainly entail a great hardship on a litigant who had won a meritorious suit, to reverse his judgment, solely because the court had given an instruction out of time. In my opinion, it would be to reverse the trial court in spite of the fact that this Court could see clearly that the error complained of worked no prejudice.

We all agree, however, that the statute was not meant to deny to the court the right to instruct the jury, when asked to do so by the jury themselves. Section 5 of the act concludes with the following language: "no instruction shall be read twice, unless it be necessary to read them after being changed as provided in section 1 of this chapter, or upon special request by the jury." This provision impliedly authorizes the court to give to the jury an instruction not previously read to them, after the case has been submitted, if the jury so request. The

request by one juror, the others not objecting, may very properly be considered a request by the jury.

A number of other assignments are made, but what we have already said sufficiently answers them; and it is not necessary to point them out specifically in this opinion. Our conclusion is to affirm the judgment.

*Affirmed.*