# CHARLESTON.

BEAMER et als. v. CLAYTON et als.

Submitted September 17, 1918. Decided September 24, 1918.

1. CANCELLATION OF INSTRUMENTS—Bill—Sufficiency.

A bill alleging plaintiffs to be the brother, sister, and nieces of a deceased sister and aunt who died without issue, and that by the laws of descents and distributions the real estate, the subject of the suit, would pass by inheritance to them, and that they are the only ones interested in her estate, substantially alleges intestacy of the deceased relative and legal title in them, and is good on demurrer. (p. 582).

2. EVIDENCE—Declarations of Deceased Grantor—Duress and Undue Influence.

While the declarations of a deceased testator or grantor made before and after the making of an instrument may not properly be admitted in evidence of the fact of duress or undue influence, they may be received as showing his or her state of mind and belief under which such instrument was executed. (p. 582).

3. SAME—Admissions.

The admissions of a husband made before and after procurement by him from his wife of deeds for her real estate that he forced her to make and execute the same, are properly admitted in evidence of force employed by him and as operating on her at the time of the making of the deeds. (p. 584).

4. DEEDS—Bill to Set Aside—Duress.

When a husband has by personal abuse, and by threats of bodily injury to herself and near relatives and by threats of abandonment, put his wife in a state of fear and deprived her of the free exercise of her will in the premises and thereby obtained from her deeds for her land, such deeds may in a court of equity be set aside and annulled on the ground of duress, undue influence or wrought compulsion. (p. 586).

5. EVIDENCE—Admissions.

Proof of a husband's admissions of force in the procurement of deeds for his wife's lands amount to more than mere disclaimers of right and title acquired thereby; they amount to admissions of facts constituting fraud and undue influence voiding and nullifying such deeds and are admissible in evidence on such issue. (p. 589).

Appeal from Circuit Court, Monongalia County.

Bill by Sarah Beamer and others against Ulysses W. Clay-

ton and others.   Decree for plaintiffs, and defendants appeal.

*Affirmed.*

*L. V. Keck,* and *Frank M. Brand,* for appellants.

*Moreland & Guy,* for appellees.

MILLER, JUDGE:

The plaintiffs, as heirs at law of Jerusha Stull Clayton, deceased, brought this suit to set aside two sets of deeds, by the first of which, dated September 18, 1912, the defendant Ulysses W. Clayton and the said Jerusha Stull Clayton, his wife, purport to have conveyed to defendant James P. Kirby, and the said Kirby to the said Ulysses W. Clayton, all the coal and mining rights in and under a tract of 12.7 acres of land which the said decedent had inherited from her father's estate; and by the second of which set of deeds, dated April 20, 1915, the said Clayton and wife also purport to have conveyed to the defendant J. N. Eddy, and the said Eddy to the said Ulysses W. Clayton, one half or the oil and gas under said tract, being all the interest of the said decedent therein, the ground or basis for the relief sought being want of consideration, and duress and undue influence exerted by the said Ulysses W. Clayton upon his wife in the procurement of said deeds.

From the decree of the circuit court pronounced on November 20, 1917, cancelling said deeds, the defendant Clayton has appealed.

The first point of error relied on is that defendant's demurrer to the bill should have been sustained, the only ground of demurrer being that there is no allegation of intestacy on the part of the decedent, wherefore no showing of interest in or inheritance of the land by plaintiffs.   It is conceded that there is no direct allegation of intestacy, but that such intestacy is indirectly and substantially alleged.   The allegations relied on are that plaintiffs "are the brother, sister, and nieces, * * * * * and all of the heirs at law of the said Jerusha Stull Clayton, she having died without issue; that under the laws of descents and distributions as provided for in the statute laws of the State of West Virginia, the real

estate of the said Jerusha Stull Clayton would upon her death
pass by inheritance to these plaintiffs." "That the plaintiffs
are the only heirs at law of the said Jerusha Stull Clayton,
*and the only ones* interested in her estate", etc. It is in-
sisted on behalf of plaintiffs that these allegations sufficiently
plead their rights by inheritance, and that the evidence of
intestacy is proven by direct and positive proof.

While somewhat informal, we think that under the liberal
rules of equity pleadings authorized by section 29, chapter
125, of the Code, and the practice obtaining generally in
equity courts, the pleading is sufficient to put the fact of
intestacy in issue, and to apprise the defendants of the issue
thus presented. *Sturm* v. *Fleming,* 22 W. Va. 404; *Hays* v.
*Heatherly,* 36 W. Va. 613, 620; IV Minor Inst., Part II, ed.
1879, p. 971.

On the main issues, duress and undue influence, affirmed
by the bill and denied by the answer, the court below at the
hearing sustained exceptions to much of the evidence of
plaintiffs' witnesses. This excluded evidence related, first,
to the supposed declarations of the deceased to the witnesses,
some made to plaintiffs and some to disinterested witnesses,
as to the treatment of her by her husband, and as to direct
and indirect threats made against her life, and that of her
relatives as inducements to her executing the deeds to him;
second, to admissions made by him before and after the mak-
ing of said deeds as to her state of mental fear of him to
which he had by his conduct reduced his wife, and that he had
procured her to execute said deeds by force exerted upon
her; and by threats of abandonment if she did not do so.

The record shows that these parties were married January
24, 1912; that shortly afterwards in September of that year
Clayton procured from his wife, a deed for the coal and min-
ing rights; that a little more than a year afterwards, in
October, 1913, he was adjudged insane and sent to the asylum,
where he remained until February, 1915, when he was dis-
charged as cured, and that in the month of April following
he procured from his wife a deed of her oil and gas in said
land. The evidence admitted also shows that almost from
the beginning, and except for the period of his confinement

in the asylum these people lived in a state of domestic infelicity; that he was quarrelsome and abused her with coarse language, if not by striking her, and that he acquired great dislike for her relatives; and that he threatened on one or more occasions to abandon her, is proven, and the evidence tends strongly to support the theory that she was depressed by his conduct and induced thereby to commit suicide by drowning. He admits he said to her just before she took her own life that he would not live with her on Jake's Run, but that she drowned herself and that had saved him the trouble; that though notified of her death, and situated only a few miles away he did not so much as return to attend her funeral, or show her the decent respect of a husband, and from whom he had by the deeds involved obtained practically all her patrimony. Such treatment goes very far to establish want of love and affection on his part and to indicate the fact that she would not likely have voluntarily made him deeds for all her property.

Before proceeding to dispose of the case on its merits it is necessary to determine, on the cross assignments of error, whether the court below properly excluded the hearsay evidence of the witnesses as to the declarations of Mrs. Clayton, and the evidence of defendant's admissions that he procured these deeds by force.

With respect to the evidence of Mrs. Clayton's declarations, it is contended first, that they are hearsay, and that the acts and conduct of Clayton are not shown to have had any direct connection with the execution of the deeds. The substance of this evidence is that Clayton abused his wife in numerous ways, tore her clothes, called her bad names, threatened to kill her, and to abandon her if she did not make him a deed for the coal and mining rights covered by the first set of deeds, and that afterwards, and after his release from the asylum, that he had been fussing with her and "*wracking*" with her and wanted her to make him a deed for her land and oil and gas, and that though advised by the witness to whom she made this statement that she had better keep it in her own name, the fact proven is that within two months

after being released from the asylum he succeeded in procuring from her the second set of deeds for the oil and gas.

It is moreover objected to this evidence that it is in part by the evidence of plaintiffs, interested witnesses, and not admissible, and that as to that portion of the evidence it is clearly incompetent at common law and by the statute, section 23, chapter 130, Code, this objection applying both to their evidence of her declarations and of his admissions to the same witnesses. As to her declarations as well as his they were made to other witnesses besides plaintiffs, and if admissible we need not consider the latter's testimony.

It seems to be well settled by the authorities that while such declarations by a deceased testator or grantor may not be received as evidence of the fact of duress or undue influence, yet they are admissible for the purpose of showing the state of mind and belief under which a will or deed has been executed. *Dinges* v. *Branson,* 14 W. Va. 100; *Ritz* v. *Ritz,* 64 W. Va. 107, 115, et seq., and authorities cited; 3 Wigmore on Evidence, pp. 2241, 2252; *Rusling* v. *Rusling,* 36 N. J. Eq. 603, 607. The principal objection to such evidence is that it is hearsay, and fraught with dangers generally attributable to that class of testimony, and as not being the best evidence. But where, as is the general rule, in transactions between the parties to a will or deed, the testator or grantor is dead, his or her declarations as to what actually took place are in most instances the best if not the only evidence thereof, for the survivor and beneficiary of the transaction would naturally suppress the fact. 16 Cyc. 1207, paragraph 4; *Hartman* v. *Strickler,* 82 Va. 225.

Thus limited to the question of the condition of Mrs. Clayton's mind and the circumstances of the execution of the deed, we are of opinion that her declarations as detailed by the witnesses other than the plaintiffs were clearly admissible, and ought not to have been excluded by the circuit court.

On the question of the admissibility of the testimony of the plaintiffs and other witnesses as to the admissions by the defendant Clayton of force and undue influence in procuring said deeds, we think the law well settled in favor of their

admissibility, and whether made before, at the time, or after the procurement of the deeds. It is objected that they are inadmissible because they do not have direct relation to the date or time of executing the instruments. But must they not be regarded as having relation to that time? When he admits according to the testimony of these witnesses that he forced his wife to make these deeds for her coal and mining rights, if her action was the result of this force on his part, it must have been in operation at the time of the execution of the deeds, and the result of conduct then or previously imposed upon her.

While there is no legal presumption of fraud or undue influence, in transactions of this kind between husband and wife, *Stewart* v. *Lyons*, 54 W. Va. 665, *Bade* v. *Feay*, 63 W. Va. 166, nevertheless, the law does recognize a distinction between transactions between persons standing in such confidential or fiduciary relations, and persons dealing at arm's length. 9 Cyc. 451-456. The law takes note of the fact, according to these authorities, that as a general rule a husband has dominating and commanding influence over his wife, and that while he may use his persuasive influence, he may not use force to compel her against her will to convey him her property, without liability of having his actions and conduct reviewed and corrected by a court of equity.

But it is contended that admitting the excluded evidence of Clayton's admissions, neither duress nor undue influence is established thereby justifying the decree; that his admissions of force do not necessarily imply threats of life or bodily injury, or such other wrongs as will satisfy the rule of duress at common law, nor that his influence upon her was such as to destroy her free agency and substitute his will for that of her own. But we think his admission of force, particularly under the circumstances of this case, does imply a putting of her in chains, and substituting his will for hers. To one of the witnesses, Samuel Stull, he is sworn to have said, with particular reference to the deed for the coal and mining rights, that he had forced his wife to give him that deed. This was before he was adjudged insane. After he was discharged from the asylum as cured, he said to another

witness, George G. Eddy, "It is not so, I didn't threaten her life, but I told her that men had killed women for just such things as that." According to the witnesses numerous admissions of force were made by him after his discharge from the asylum. But when he made some of the first of these admissions he seemed to be in a humble or penitent state of mind; admitting his guilt, he proposed to right his wrong by reconveying the property to Mrs. Clayton. A little later, according to the testimony of Clark Wright, he changed his mind, and declared that he did not intend to give her back the coal. He seems to have been soon thereafter seized with a disposition to get from his wife her remaining interest in the property, and did procure from her, within two months after he had returned from the asylum, a deed for her oil and gas interest. As to these last deeds there is no direct evidence of force or other undue influence, except that he himself admitted on the stand, just before her suicide that he had said to her that he would not live with her on Jake's Run, but that she had drowned herself and had saved him the trouble. According to one of the declarations of Mrs. Clayton, given in evidence, already alluded to, it appears that Clayton had been fussing with her, and as she says *wracking* with her, to induce her to make him a deed for her land and oil and gas. All this evidence, if in no way connected with the previous transactions between the parties would not in our judgment be sufficient to overthrow the deeds for the oil and gas, but considered in the light of the previous transactions between the parties relating to the coal and other mining rights, the circumstances and conditions surrounding them, the threats then and previously made against her, his threats of abandonment, her mental state of fear for her personal safety and that of her relatives, we think it may reasonably be inferred, that he obtained the latter deeds under the same or similar conditions under which the first were executed, and that though disconnected in time, the transactions should be considered as one scheme upon the part of the defendant to obtain by force and intimidation the property of his wife, all of which she had inherited from her father's estate.

The rigorous rules of the common law respecting undue

influence and duress have been greatly modified. The modern rule as stated by Mr. Pomeroy, 2 Pomeroy's Equity Jurisprudence, (3rd ed.) section 950, is: "Whenever a conveyance or contract is obtained by actual duress, equity will grant relief, defensively or affirmatively, by cancellation, injunction, or otherwise, as the circumstances may require. In determining what constitutes duress,—what force or threats, —equity follows the law. Courts of equity undoubtedly grant relief in many classes of instances where there is no legal duress, and where the wronged party would perhaps be remediless at the common law, but these cases properly belong to the head of 'undue influence' ". And in section 951, this writer says, defining undue influence: "Where there is no coercion amounting to duress, but a transaction is the result of a moral, social, or domestic force exerted upon a party, controlling the free action of his will and preventing any true consent, equity may relieve against the transaction, on the ground of undue influence, even though there may be no invalidity at law." And among the relations to which this equitable doctrine is liable is included husbands and wives, and persons occupying their position. Idem, section 953. And in Hogg's Equity Principles, page 95, it is said: "Proof of acts of undue influence exerted, both before and after the time when the instrument in question was made, may be received in evidence." Citing our case of *Forney* v. *Ferrell*, 4 W. Va. 729, and other authorities. And to the same effect is *Hartman* v. *Strickler*, *supra*. In Leake on Contracts, 6th ed., an English book, under the subject Duress, page 285, this writer says: "The Court of Chancery, besides a concurrent jurisdiction in cases of legal duress, exercised and extended jurisdiction to grant relief in various cases of pressure which did not amount to duress at common law." True, and in accordance with our decisions, this writer says, at page 291, "The relationship of husband and wife does not give rise to this presumption of undue influence, which must be proved affirmatively to set aside the wife's contract." But as already noted, the books do make a distinction between parties dealing at arm's length, and those cases involving transactions between husband and wife

in measuring the degree of evidence necessary to show duress or undue influence. 9 Cyc. 456, paragraph 6. And in the leading case of *Galusha* v. *Sherman,* 105 Wis. 263, 277, approving the doctrine of an Alabama case cited, it is said: "The more advanced doctrine is that stated in the Alabama case cited. Under it, advantages obtained by what was considered duress by old common law rules, or such rules as changed, in respect to the standard of resisting power which the threatened person is legally bound to exercise for his own protection or be remediless at law for the consequences, and in respect to the nature of the threats deemed legally sufficient to overcome a person of the legal standard of resisting power, and also advantages wrongfully obtained, though not by duress, in law, and remediable as such, but remediable in equity upon the ground of unjust compulsion, are now practically in one class. Duress, in its broad sense, now includes all instances where a condition of mind of a person, caused by fear of personal injury or loss of limb, or injury to such person's property, wife, child, or husband, is produced by the wrongful conduct of another, rendering such person incompetent to contract with the exercise of his free will power, whether formerly relievable at law on the ground of duress or in equity on the ground of wrongful compulsion." And after reviewing the authorities on the subject at some length, the court says: "From the foregoing it will be seen that the true doctrine-of duress, at the present day, both in this country and England, is that a contract obtained by so oppressing a person by threats regarding his personal safety or liberty, or that of his property, or of a member of his family, as to deprive him of the free exercise of his will and prevent the meeting of minds necessary to a valid contract, may be avoided on the ground of duress, whether the oppression causing the incompetence to contract be produced by what was deemed duress formerly, and relievable at law as such, or wrongful compulsion remediable by an appeal to a court of equity. The law no longer allows a person to enjoy, without disturbance, the fruits of his iniquity, because his victim was not a person of ordinary courage; and no longer gauges the acts that shall be held legal-

ly sufficient to produce duress by any arbitrary standard, but holds him who, by putting another in fear, shall have produced in him a state of mental incompetency to contract, and then takes advantage of such condition, no matter by what means such fear he caused, liable at the option of such other to make restitution to him of everything of value thereby taken from him.''

In 9 R. C. L. 721, paragraph 10, it is said: ''Threats of bodily harm made by a husband to his wife will of course constitute duress, but other acts or threats of the husband not amounting to threats of personal violence may also amount to such duress as will be ground to avoid a contract entered into by the wife under the influence of the threats.'' And for this proposition numerous decisions are cited, to which we also refer.

But the final contention of the appellant is that the admissions of the defendant Clayton cannot be received to overthrow his title to land. Citing for the proposition *Printup* v. *Mitchell*, (Ga.) 63 Am. Dec. 258, and our case of *Delaplain* v. *Grubb*, 44 W. Va. 612, 617. It may be true according to these decisions, although it was not a point of decision in *Delaplain* v. *Grubb*, that one cannot lose his land by mere admissions or parol disclaimer. This is self evident. It requires a deed to divest title once invested by valid legal conveyance. If the question here was whether the defendant had forged the name of his wife to the deed involved, and the evidence was that he had on numerous occasions admitted his forgery, such evidence would certainly be competent on the question of the fact of forgery, and it is no less true we think that his admissions of force in procuring the deeds fraudulently and contrary to the will of his wife may also be received in evidence on the question of fact. If the deeds from his wife were obtained by force, duress or undue influence they were not her deeds, and upon principle may be avoided in equity.

Upon the evidence admitted and that which should have been admitted and considered by the circuit court we are clearly of the opinion that the decree should be affirmed.

*Affirmed.*