332 S.E.2d 114

**MIAMI COAL CO., INC., etc.**

v.

**Frank HUDSON, etc., et al.**

**No. 16066.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 30, 1985.

Decided April 11, 1985.

Rehearing Denied June 11, 1985.

tence for assault commenced prior to trial and   conviction for manslaughter).

Paul E. Parker, Jr., Fairmont, for appellee.

Herschel Rose, Duane Southern, Jeffrey Jackson, Rose, Southern & Padden, Fairmont, for appellant.

NEELY, Chief Justice:

This is an appeal from a civil action instituted in the Circuit Court of Marion County in December 1979 to recover funds allegedly misappropriated over a number of years by Irene Mae Hudson and her husband Frank from the Miami Coal Company. The circuit court applied a five-year statute

of limitations to the action. Frank Hudson was sued both personally and as the administrator of his wife's estate. In addition, Banker's Life Insurance Company instituted an interpleader action against both Frank Hudson and Miami Coal Company to determine the proper beneficiary of a policy that Irene Mae Hudson had with that company. On 20 October 1982 judgment was entered for the Miami Coal Company against Frank Hudson as administrator of his wife's estate in the amount of $100,-566.73 and against him individually for $14,177.13. The jury found, however, that Frank Hudson was the proper beneficiary of his wife's life insurance policy.

Upon review of the record, this Court finds that the evidence is sufficient to prove that the appellant and his wife misappropriated funds from the Miami Coal Company. In addition, this Court does not find that the Dead Man's Statute, *W. Va. Code* 57–3–1 [1937], was violated by the trial court. Accordingly, we affirm.

I

Among Andrew Konya's children were two sons and one daughter. Father Andrew, the founder of the Miami Coal Company, built three houses side by side in Meredith Springs, Marion County, for these three children. His two sons, Andrew, Jr. and Adolph, ran the underground mining business of their family's closely held corporation while their sister, Irene, was Miami Coal's bookkeeper. She worked out of an office in the basement of her home. From this office Irene did the taxes, paid accounts, prepared checks, and with her husband Frank Hudson, fetched the mail from a post office box in Rivesville. Apparently only she wrote company checks after 1975.

When Andy, Jr. passed away in 1971 the Konya family assembled and decided that brother Adolph (and his wife Mary) should be the only shareholders of the Miami Coal Company. After Adolph's death in 1976, Mary Konya, as sole shareholder of the corporation under his will, elected herself president. The management of the underground mining operation and the business affairs of Miami Coal was, however, undertaken by Adolph and Mary's son William and their nephew Steve. Adolph's sister Irene continued as bookkeeper of Miami Coal until her death in the spring of 1979.

Miami Coal's accountant since 1975 was Mr. Jack Oliver, a partner in the accounting firm of Tanner and Tanner, in Morgantown. Irene's bookkeeping was periodically deposited with Mr. Oliver who made various entries on general ledgers and books of account for the corporation and from which he prepared the company's tax returns. It was Mr. Oliver who brought the possibility of corporate misappropriation to Mary Konya's attention.

The apparent custom and practice of the Miami Coal Company was for Irene Hudson to make all corporate payments. She prepared a duplicate of each check, recorded the purpose of the payment, and processed the check through a machine. She then delivered it to be signed, usually by either Adolph or Mary. After the check had cleared it would be returned to Irene. The duplicates of each check were periodically delivered by Irene Hudson to Jack Oliver so that he could prepare various accounting records and tax returns. He then returned all the cancelled checks, bank statements, and other corporate documents to Irene. All cancelled checks and checking records were kept in the Hudson's basement, Miami Coal's "corporate office."

In August of 1978, however, Mr. Oliver did not, as before, return cancelled checks of Miami Coal to Irene Hudson. Rather, he took them to Adolph's wife, Mary Konya, (the corporation's president) because he felt many of the checks written could not be justified as corporate expenses. By her own admission, this was the first time that Mary Konya examined cancelled checks and back statements prepared by Irene Hudson. She instructed Mr. Oliver to retrieve the 1976 and 1977 cancelled checks as well; Mary Konya believed that her name and that of her husband had been forged numerous times. But because Mary was fond of her sister-in-law, she testified she took no action against Irene

Hudson until after Irene died when she sued her estate.

In early 1979, the Internal Revenue Service audited Miami Coal Company's returns for the previous three years. The IRS did not approve of certain business expense deductions by the company over a number of years. The IRS proposed to disallow $189,000. Shortly after this audit, on 11 March 1979, Irene died.[1]

In September of 1979, after receiving an extension in filing its 1978 tax return, Miami Coal Company deducted over $189,000 from its tax return as embezzlement expenses. The company claimed that over the years Irene Hudson had embezzled that amount in corporate funds. (Under the regulations of the Internal Revenue Service the entire amount of an embezzlement may be deducted in the year of its discovery.) However, the Internal Revenue Service balked at this deduction. Litigation concerning this matter was still pending when this case was tried. Shortly after the ruckus with the IRS, the Miami Coal Company sued Frank Hudson as administrator of the estate of Irene Hudson and individually for $189,263.42, the amount it sought to deduct from its federal taxes. It was, perhaps, only as a result of the *ennui* caused by the IRS that this suit was prosecuted among relatives who apparently had lived happily out of one another's and the Internal Revenue Service's pockets for many years.

Miami Coal called nineteen individuals to testify at the trial. Each of these individuals' names had appeared as payees and/or endorsers of Miami Coal corporate checks. However, the vast majority of these payees denied endorsing the corporate checks, receiving the proceeds of the checks, and denied rendering services or delivering merchandise. Other witnesses admitted that exhibited checks were received in payment for non-corporate purposes. For example, Mr. and Mrs. Roy Weaver sold Indian jewelry from their home in Fairmont. They received $2,455.09 on a Miami Coal check from Irene "for work performed by

the company." The only work performed, however, was the sale of their jewelry. Miami Coal checks, signed ostensibly by either Adolph or Mary, were presented for payment. Similarly, other jewels, stereos, CB radios, vacuum cleaners, improvements on the Hudsons' home, and clothing were paid for by Miami Coal Company checks presented by Irene or Frank and purportedly signed by Adolph or Mary. Mary vehemently denied signing such checks and, furthermore, denies the authenticity of Adolph's signatures.

Jack Oliver testified that he had mentioned to Adolph, before his death in 1976, the existence of questionable check-writing practices of the Miami Coal Company. Apparently, Adolph did not seem overly concerned and chose to take no action other than to modernize Irene's facilities and put the corporate records onto a computer. Mr. Oliver also testified that Irene retained almost absolute control over the check preparing authority until her death in March of 1979. Although implicitly disputed by Frank Hudson, it does not appear that Irene had any authorization to sign Miami Coal Company checks and, alternatively, that only Adolph and Mary Konya before 1976, and Mary, Steven, and William Konya after 1976 could sign company checks.

## II

The appellant alleges four errors, the first of which is that it was error to allow Mary Konya, who became president of the Miami Coal Corporation only in 1976, to testify to the prior financial practices of the coal company. The appellant insists that Mary Konya had no personal knowledge of company practices and thus, that her testimony about Miami Coal activities before 1976 was improperly admitted. Second, the appellant asserts that Mary Konya's testimony that numerous Miami Coal Company checks bore a forged facsimile of her husband's signature violated the Dead Man's Statute, *W. Va. Code* 57–3–1 [1937]. Third, the appellant alleges a dearth of evidence to sustain a showing that the de-

---

**1.** Different dates are cited in the briefs for Irene's death, but 11 March 1979 appears most frequently; thus we assume Irene Mae Hudson died on this date.

fendants converted Miami Coal funds to their own benefit. Finally, appellant maintains that it was reversible error to refuse to direct a verdict or to set aside the jury verdict itself.

As to the first assignment of error, that Mary Konya lacked personal knowledge of company practices before her husband's death, the appellant insists that his and the estate's liability for approximately $34,000 of checks written before the 23rd of October 1976 (when Adolph died) was based solely on Mary Konya's testimony that these checks were not authorized corporate expenditures and that they were inconsistent with the prior "custom and practice" of the company. He thus maintains that it was reversible error to admit evidence from a witness who lacked personal knowledge to the facts to which she testified. *See* Syl.Pt. 12 *Browning v. Hoffman,* 90 W.Va. 568, 111 S.E. 492 (1922).

We disagree, however, that Mary Konya lacked such personal knowledge. The Miami Coal Company is a closely held family operation in which all the actors involved on its stage are intimately connected with one another. There is evidence that Mary Konya's husband Adolph ran Miami Coal with an iron fist, but Mary Konya was, indeed, signing checks before his death and, as Adolph's wife, presumably was informed about the doings of the company. She certainly was qualified to testify that at this time signatures on checks were not her own and to testify as to the genuineness of her husband's signature. *See* section III, *infra.* Accordingly, we do not find any merit in this assignment. Although the defendant could have argued to the jury that Mary Konya's testimony was not entitled to great weight, the problem was one of credibility of evidence and not admissibility. Syl. Pt. 1, *Tennessee Gas Transmission Company v. Fox,* 134 W.Va. 106, 58 S.E.2d 584 (1950).

### III

Irene Hudson and her brothers, Adolph and Andrew, with whom she transacted corporate business before Adolph's death in 1976 are all dead. Frank Hudson argues strenuously that it is reversible error for Mary Konya to testify about the genuineness of Adolph's signature on numerous checks because it is conceivable that Irene was authorized to sign Adolph's name. Therefore, only Adolph Konya could rebut Mary's testimony that, if Irene did sign his name on Miami Coal checks, it was done without his permission. As Adolph Konya died in 1976, Mary's testimony relates to personal transactions or communications with a dead person and thus, *W.Va.Code* 57-3-1 [1937] (The Dead Man's Statute) governs and was misapplied by the trial court.

*W.Va.Code* 57-3-1 [1937] provides in pertinent part:

No person offered as a witness in any civil action, suit or proceeding, shall be excluded by reason of his interest in the event of the action, suit or proceeding, or because he is a party thereto, except as follows: No party to any action, suit or proceeding, nor any person interested in the event thereof, nor any person from, through or under whom any such party or interested person derives any interest or title by assignment or otherwise, *shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at the time of such examination, deceased,* insane or lunatic, against the executor, administrator, heir at law, next of kin, assignee, legatee, devisee or survivor of such person, or the assignee or committee of such insane person or lunatic ... [Emphasis added by this Court.]

It has oft been stated that the purpose of the Dead Man's Statute is to prevent an undue advantage on the part of a survivor over a decedent. F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* 43 (1978); Note, "Re-evaluation of the Dead Man's Statute," 69 *W.Va.L.Rev.* 327, 328 (1967). In such circumstances the decedent is unable to confront the survivor, give his version of the affair, and expose the possible omissions, mistakes or perhaps even outright falsehoods of the survivor. The Dead Man's Statute presumes that the temptation to lie and conceal material facts

158

to the disadvantage of the deceased, especially by interested parties, is very strong in cases where the deceased's estate is involved in litigation. For this reason, the statute prevents the surviving party from testifying to personal transactions or communications with the deceased. Long ago this Court stated:

> The principle objection to such evidence is that it is hearsay, and fraught with dangers generally attributable to that class of testimony, and as not being the best evidence. But where, as is the general rule, in transactions between the parties to a will or deed, the testator or grantor is dead, his or her declarations as to what actually took place are in most instances the best if not the only evidence thereof, for the survivor and beneficiary of the transaction would naturally suppress the fact.

*Beamer v. Clayton*, 82 W.Va. 580, 584, 96 S.E. 969, 971 (1918).

■ The appellant pleads that the Dead Man's Statute, while recognized as applicable in the case before us by the trial court, was not properly enforced. Certainly the appellant is correct in stating that testimony by interested persons, such as Mary Konya, is incompetent if it concerns personal transactions or communications with a decedent. It is equally true that the phrase, "personal transactions" as used in the Dead Man's Statute, has been broadly construed to "include every method whereby one person may derive impressions or information from the conduct, condition or language of another." Syllabus Point 5, *Freeman v. Freeman*, 71 W.Va. 303, 76 S.E. 657 (1912).

■ In *Kuhn & Hoover v. Shreeve*, 141 W.Va. 170, 89 S.E.2d 685 (1955), this Court announced a test to determine when evidence should be excluded under the Dead Man's Statute. We stated:

> The test generally accepted is to the effect that if a deceased person were alive and testifying, or an insane person were sane and testifying, could the testimony of a witness testifying in opposition to a transaction or communication be disputed by the testimony of the absent witness.

141 W.Va. at 177, 89 S.E.2d at 690.

This rule is correct, but must be seen in context as excluding only the testimony of an interested witness as to a fact the knowledge of which is derived dependently from a personal transaction or communication with the deceased or incompetent.

The appellant believes that it violated the statute for Mary Konya to testify about the genuineness of her husband's signature. Mary never, however, stated that she saw Irene Hudson forge a particular signature; clearly, such testimony would be strictly barred by the Dead Man's Statute. Rather, Mary and her son William offered their opinion of an independent fact; namely, that the signatures on numerous particular checks did not belong to Adolph Konya.

West Virginia, like most jurisdictions, permits testimony of interested witnesses in order to identify the handwriting of a deceased person when knowledge of the deceased's handwriting was not obtained in a transaction under dispute. Handwriting is usually considered to be opinion evidence that the deceased, even if he were alive, couldn't contradict; the witness is only expressing his opinion. *See* Annot., 13 A.L.R.3d 404.

In *Johnson et al. v. Bee et al.*, 84 W.Va. 532, 100 S.E. 486, 7 A.L.R. 252 (1919) this Court was confronted with the genuineness of a grandmother's signature on a declaration of trust. We concluded that a mere opinion could not be contradicted by the deceased and held that such testimony was admissible because the witness' knowledge was not gained from any transaction with the deceased. In Syllabus Point 2, we stated:

> Grandchildren who have obtained their knowledge of their grandmother's handwriting, only by inspection and repeated readings of letters from the grandmother to their mother, preserved by the family for a long period of time, for sentimental reasons, are qualified to testify to their

opinions as to the genuineness of the grandmother's signature.

84 W.Va. 532, 100 S.E. 486.

In *Poole v. Beller*, 104 W.Va. 547, 140 S.E. 534, 58 A.L.R. 207 (1927) the Court was confronted with the deceased's signature on a promissory note. This Court stated that to introduce a witness' knowledge of a decedent's signature, that knowledge must be obtained otherwise than by personal transactions with the decedent. We held, in Syllabus Point 2:

> A step-daughter reared from infancy by the step-mother until she was seventeen years of age, and since that age has carried on with her a voluminous mutual correspondence extending over many years, and who says that she is familiar with her step-mother's handwriting is, from these facts and circumstances competent to testify as to the genuineness of the step-mother's signature to a disputed writing although the step-mother is deceased and the witness is a party to the litigation.

104 W.Va. at 548, 140 S.E. 534.

■ This is the general rule in a majority of jurisdictions. In *Kerwin v. Bank of Douglas*, 93 Ariz. 269, 271, 379 P.2d 978, 980, 13 A.L.R.3d 398, 401 (1963), the Supreme Court of Arizona was confronted with a Dead Man's Statute substantially similar to our own. That court stated:

> The statute was not intended to place an absolute prohibition on all testimony by parties to the action, but on the contrary, was meant to limit incompetency to matters involving a transaction with or statement by the deceased. Such matters, it is assumed, are of a nature that the deceased would contradict them, if he were alive, and it is thought that to admit evidence which the estate may not be able to rebut will result in injustice. *On the other hand, testimony bearing on the genuineness of a signature falls in the category of opinion evidence relating to an independent fact.* While it is unquestionably material in an action on a negotiable instrument, *it does not qualify as either a transaction or a statement.*

379 P.2d at 980 [emphasis added, and footnote removed, by this Court].

We are entirely in accord with this general statement of the law and hold that the testimony of witnesses denying the authenticity of the purported signature of a deceased as corporate officer or as payee on a challenged check was admissible under *W.Va.Code* 57-3-1 [1937] because such testimony was opinion evidence that was based upon independent knowledge and not upon a personal transaction or communication with the deceased.

## IV

■ The next assignments of error to which we are directed concern the failure of the trial court to direct a verdict at the conclusion of the evidence and the subsequent failure of the court to set aside the jury's verdict and grant a new trial. These two assignments may be considered together because both depend on the same principles. As this Court stated recently in Syllabus Point 5 of *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983):

> In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Only when the evidence decidedly "preponderates against the verdict of a jury or the finding of the trial court upon the evidence" will this Court reverse the judgment. Syllabus Point 5 *Estate of Bayliss by Bowles v. Lee*, 173 W.Va. 299, 315 S.E.2d 406 (1984). This is not such a case.

■ The appellant maintains that conversion was not sufficiently proven in four of the six categories into which he had organized the checks. However, the appellant *does admit* that there is "some evidence of conversion to the benefit of the Hudsons"

in those checks that were made payable directly to Frank and/or Irene Hudson. These checks total some $14,351.59. The appellant also admits that checks payable to merchants and others who testified to receiving Miami Coal checks for goods and/or services provided directly to Frank and/or Irene Hudson could be construed as evidence of conversion to the use or benefit of the Hudsons as well. Checks in this category total some $7,500.

In the remaining four categories into which the appellant has chosen to groups the checks, the appellant insists that there is insufficient evidence that these disbursements accrued to the benefit of Frank and/or Irene Hudson. Appellant argues, therefore, that the trial court ought to have directed a verdict at the conclusion of the evidence or should have entered a judgment notwithstanding the verdict rendered by the jury.

■ At the outset we note that it is not a prerequisite for Miami Coal Company to prove that the corporate funds were converted to the Hudsons' use or to their benefit. Indeed:

> Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion and it is not necessary that the wrongdoer apply the property to his own use. And when such conversion is proved the plaintiff is entitled to recovery irrespective of good or bad faith, care or negligence, knowledge or ignorance.

Syl.Pt. 3 of *Pine and Cypress Manufacturing Company v. American Engineering and Construction Company*, 97 W.Va. 471, 472, 125 S.E. 375 (1924).

Miami Coal's original claim against the estate of Irene Mae Hudson and Frank Hudson exceeded $189,000. Under the evidence the jury could have found against the estate and Frank Hudson in an amount more than the actual verdict. Since it is not plainly and decidedly against the weight of the evidence, it cannot be disturbed on appeal. *See* Syl.Pt. 1, *Everett v.*

*Brown*, 174 W.Va. 35, 321 S.E.2d 685 (1984).

### V

■ Finally, the appellant argues that even if he or Irene forged the name of corporate officers on Miami Coal Company checks to their own benefit, their so doing was simply in accordance with the usual custom and practice of the Miami Coal Company. Thus, the Miami Coal Company acquiesced in Irene Hudson's signing of Adolph or Mary Konya's names on the checks that she prepared.

This argument is also spurious. The trial court found no evidence that either Irene or Frank Hudson was authorized to sign any checks at all. Although the Miami Coal Company is a small mom and pop type business that was not traditionally overly careful in maintaining its corporate accounts, the trial court was satisfied that as soon as Mary Konya became aware of Irene's questionable check-writing habits she initiated the investigation that led to this action and that Irene Hudson had misappropriated the funds unilaterally for her own, and not the coal company's, benefit.

On the other hand, had it been accepted practice for Irene Hudson to buy things for her husband and herself from corporate funds, she would have had no reason to forge signatures or conceal these checks from other members of the corporate family. In any case, the jury weighed Frank Hudson's credibility against that of Mary Konya, her son, and nephew, to find that Irene and Frank diverted funds from the corporate treasury improperly under Miami Coal Company custom and practice.

For the foregoing reasons, the judgment of the Circuit Court of Marion County is affirmed.

Affirmed.