# CHARLESTON.

GEORGE T. LUCAS v. ROBERT HENSLEY *et al.*

Submitted October 30, 1917.   Decided November 6, 1917.

1. LOST INSTRUMENTS—*Lost Deed—Title—Evidence.*

   To establish title to land under an alleged lost deed, on parol testimony, proof that it existed, and of its contents, must be clear and conclusive.   (p. 240).

2. SAME.

   A case in which, by the application of the foregoing rule, the evidence is held to be insufficient to establish title to the land in controversy in the plaintiff under an alleged lost deed.   (p. 242).

Error to Circuit Court, Cabell County.

Ejectment by George T. Lucas against Robert Hensley and others.   Judgment for plaintiff, and defendant brings error.

*Reversed and remanded.*

*Vinson & Thompson,* for plaintiff in error.

*Maynard F. Stiles* and *Frank Lively,* for defendant in error.

RITZ, JUDGE:

Defendants complain of the judgment of the circuit court of Cabell county in an action of ejectment by which the plaintiff recovered a tract of land containing something more than seven hundred acres, situate in Logan county, West Virginia.   It is admitted that this tract of land is a part of a large tract owned by John Dempsey in his lifetime, and that the defendant United States Coal & Oil Company is the owner of this Dempsey land, unless Dempsey before his death conveyed away the parcel involved in this suit.   The plaintiff claims under a deed executed to him by William Lucas and wife, dated the 25th day of November, 1911, and under a conveyance alleged to have been made by John Dempsey in the year 1864 to William Lucas, which conveyance it is alleged was destroyed without having been recorded.   The defendants insist that the evidence introduced to establish this

conveyance is not sufficient for that purpose. It is conceded that unless this conveyance is established the plaintiff must fail. Many exceptions were taken to the admissibility of evidence, and to the competency of witnesses introduced during the trial of the case, but in passing upon the sufficiency of the testimony offered to establish this conveyance we will treat all of the evidence introduced as competent.

In considering the evidence introduced upon this subject we must not lose sight of the principles of law which govern in cases where it is sought to substitute for a deed parol evidence of its prior existence. The spirt of our law is that title to land shall pass only by deed or will, and where it is sought to set up title under a lost deed, the evidence of the execution of such deed, of the contents thereof, and of its delivery, must be clear and convincing, approaching in dignity the conclusiveness of a written instrument. This rule has been laid down and adhered to by this Court and the Supreme Court of Appeals of Virginia without exception, and we think it is a rule based upon sound considerations of public policy. The opportunities for the perpetration of fraud in establishing titles by proof of lost instruments would be so great unless the rule was thus strictly enforced that uncertainty of land tenures would result, and the mischief thus produced would be very much greater than any injustice which may follow from the application of such a rigid rule. In the case of *Telluric Co.* v. *Bramer*, 76 W. Va. 185, it was sought to establish title to the oil and gas in a tract of land by proof of a lost deed. In that case one of the grantors in the deed, the other being dead, testified to the execution of the deed; that it had been signed and acknowledged by himself and his co-grantor; that it conveyed a one-half interest in the oil and gas in a particular tract of land. In addition to this, certain memoranda made by the grantee at the time of the transaction were introduced showing that he had made such a purchase as that indicated by the oral testimony of the grantor. It was held, however, that the evidence was insufficient to establish a lost deed. The evidence of the grantor upon which reliance was had was given twenty years after the purported execution of the paper.

He was a very old man, past the age of ninety years, and the court held that his evidence was insufficient to establish a lost paper rising to the dignity of a muniment of title. In the case of *Board* v. *Callihan,* 33 W. Va. 209, it was sought to recover upon a lost bond. It will be observed that the paper sought to be established in that case by parol evidence did not require in its execution the formality and certainty of a deed; it did not pass title to land, but was simply evidence of an obligation on the part of the one executing it to the payee. In that case three witnesses testified as to the existence of the bond sued on. The first testified that he saw the bond two years after the purported date of its execution; that he read it carefully at that time; that it provided for the payment of fifteen hundred dollars with interest from its date; that it bound the heirs and executors of the obligor; and that it was payable to the plaintiff. This witness was eighty years old at the time he gave this testimony, and it was shown that he was not familiar with obligations of this kind, and did not recollect ever having seen any other obligation of the same kind. It will be observed that this witness did not testify that he had seen the obligor sign the bond. The testimony of the second witness was substantially the same as that of the first. He saw the bond two years after the purported date of its execution, and he gives its contents substantially as given by the first witness. The third witness, however, was present at the time of the execution of the bond; he saw it delivered by the obligor to the obligee; he read it at that time; tells what was in it, and specifically gives its provisions. It was shown that all of these witnesses were more or less interested in establishing this obligation; that a long time had elapsed; and because of these facts, as well as because of the strict rule enforced in establishing lost writings by parol evidence, it was held that the bond was not established, and no recovery was allowed. Other decisions passing upon this question and laying down the rule as above stated are: *Barley* v. *Byrd,* 95 Va. 316; *Carter* v. *Wood,* 103 Va. 68; *Smith* v. *Lurty,* 108 Va. 799; *Johnson* v. *McCoy,* 112 Va. 580; *McLin* v. *Richmond,* 114 Va. 244;

*Thomas* v. *Ribble,* 2 Va. Dec. 321, 24 S. E. 241; *Dunnavant* v. *Dunnavant,* (Va.) 91 S. E. 138.

In this case there is but one witness who claims·to have seen Dempsey execute this deed. This is the mother of the plaintiff. At the time she testified she was eighty-four years of age. She states that she could neither read nor write. Her evidence is in effect that about the year 1860 she married William Lucas; that before she was married Dempsey told her that William Lucas was his natural son, and that he was going to make provision for him out of his estate; that when they were married they moved into a little cabin upon the tract of land in controversy, and remained there for a few years; that during the Civil war her husband was away part of the time, and during that time they removed from this cabin; that after her husband returned from the war in 1864 they were moving back from Peck's Mills, where the family had stayed, and being overtaken by a storm stopped at the residence of a man by the name of Fillinger; that her child was ill and they sent for Doctor Hugh Bryant to attend the sick child; that while they were there John Dempsey, the owner of the land came in; that in the course of the conversation he asked Lucas why he did not go back on the farm to reside; that it was his, and that he ought to go back and take care of it; that Lucas replied that he did not care to go back there under the uncertain conditions that then existed; that he had no title to the land; that Dempsey had told him repeatedly that he was going to make him a deed to the land, but that he had never done so, and that he did not intend to go back until he had some written assurance that he was the owner of the land; that Dempsey thereupon says, "I will make you a deed for it right now;" that paper was produced; that Doctor Bryant, who was also a justice of the peace, wrote the deed; that it was read over by Doctor Bryant in the presence of the witness, was executed by Dempsey and acknowledged before Doctor Bryant as a justice of the peace, and delivered to Lucas; that subsequently, when the weather abated somewhat, Dempsey sent his own teams to Fillinger's house and removed William Lucas and his family onto the tract of land, and that William Lucas resided on

the same continuously until the time of his death in 1912; and that his son George Lucas, the plaintiff, has occupied it ever since that time; that this deed was kept by the witness in an old trunk; that sometime in the latter seventies the house was destroyed by fire in the absence of the family from home, or the adult members of the family, and the trunk destroyed with the house; that after the destruction of the house some of the neighbors gathered together with a view of assisting Lucas in constructing a new house in which to live; that John Dempsey was among the number of such persons; that Lucas stated that he thought he had just as well leave at that time while he had nothing to leave; that his deed was burned up and he didn't know that he should build another house upon the land; that Dempsey thereupon advised him that he would execute to him another deed conveying the property; that this promise of Dempsey was never carried out; that just before Dempsey's death he advised the witness and her husband that if they would come to his house on a certain Monday morning he would have an officer there, and would execute the deed and deliver it to them; that they went at the time appointed, but that Dempsey died the night before, and the deed was never executed. This was about the year 1881. Philip C. Doss, a son-in-law of William Lucas, testified that he saw this deed when he was twelve or thirteen years of age back in the early seventies. He does not claim that he knew the signature of Dempsey or of Doctor Bryant, but he says that the names of Dempsey and Doctor Bryant were on the paper. He does not purport to give its contents, but says that from his knowledge of deeds since acquired it was in the form of a deed. Other witnesses testified that prior to the time it is said this deed was made by Dempsey he told them that William Lucas was his son, and that he was going to provide for him; and also some witnesses testified that after the time which it is stated this deed was executed, Dempsey said that he had provided for his son William Lucas by giving him, or deeding to him, the tract of land upon which he lived. Witnesses also testified that Lucas in his lifetime told them that this was his land; that it had been conveyed to him by his father John Dempsey. As before

stated, the tract of land contains more than seven hundred acres, and while the plaintiff and his ancestor have lived on it ever since the date of the purported deed, their occupation has been confined to four or five small cleared patches, aggre- gating, according to the evidence of the witnesses, at the most twenty-five acres. At the time of Dempsey's death a suit was brought to partition his lands among his heirs at law. Commissioners were appointed and they made partition of said lands. It is shown that William Lucas knew that the commissioners were dividing Dempsey's lands, and that they had included this land in the assignments made to two of the heirs of Dempsey, and that he made no claim at that time that he owned the same. It is further shown that the purchasers from the heirs of Dempsey removed all the timber from this land; that at the time they were removing this timber certain of their operations were within a very short distance of the house occupied by Lucas, and that he made no objection to the removal of this timber; that these operations went on for two or three years at one time. Plaintiff partly explains Lucas's failure to object to the removal of the tim- ber by showing by the witness Mrs. Lucas, his mother, that it was the understanding that William Lucas would not get the poplar or walnut timber, and in consideration of this reser- vation Dempsey would keep the taxes paid on the land. She accounts in this way for William Lucas's failure to object to the removal of the poplar and walnut timber, but she does not account for his standing by and seeing the oak, ash and other valuable timber removed from the land without objec- tion. It was shown by witnesses who represented the pur- chasers of this land from the heirs of Dempsey, and who were employed for the purpose of seeing that squatters and ad- verse claimants were kept off the land, that they were ad- vised by William Lucas that he had been permitted to occupy it by Dempsey for a home for himself and his family, and he requested them to see if the then owner of the land would not permit him to stay thereon, with the understanding that he would surrender possession at any time. The tract of land was unimproved and uncleared except to the extent that Lucas had cleared up the four or five little patches above

referred to.    These witnesses testify that they communicated to their principal Lucas's request, and they were advised that inasmuch as he was an old man, a soldier of the Mexican war, and had no other place to reside, to allow him to remain upon the land so long as he desired under the arrangement suggested by him, and they testify that it was because of this arrangement that he was allowed to occupy this land.    The deed from William Lucas to the plaintiff in this case was made in the fall of 1911, but it was withheld from recordation until after the death of William Lucas in 1912, and as soon as it was put to record the United States Coal & Oil Company sent its representatives to the plaintiff and advised him that it owned the tract of land, and if he desired to stay on the land he would have to take a lease from it.    He protested its title at the time, and also the title of its tenant, the defendant Hensley, and brought this suit for the purpose of having Hensley evicted from the land.  From this it will be observed that there is no written memorandum of any kind to serve as a basis for the lost deed.    The only evidence of its execution and of its contents is that of Mrs. Lucas who was at the time she testified eighty-four years old. The transaction occurred fifty-two years before.  Her recollection as to what this deed contained was based upon having heard it read on two occasions, one of which was at the time of its alleged execution fifty-two years before, and the other at some subsequent date which does not definitely appear, but certainly more than thirty-five years before the time she was testifying.    She never read it herself, because she could not read or write, and her only knowledge of it was from hearing it read on those two occasions.    It is shown in the record also that her deposition was taken in this case in April, 1914, about two years before the time she gave her testimony in open court.    At that time she testified that the deed had been executed and had been placed on record, and that not only the deed had been destroyed by fire when her residence was destroyed, but the recordation of it had likewise been burned when the courthouse at Logan had been destroyed. It will be observed that this is directly in conflict with the statement she made at the time of the trial, she then stating

that the deed had never been recorded. This, of course, is not so material except to show the uncertainty of her recollection, and how likely she was to be mistaken about matters which transpired at that distant time. She also stated, in attempting to give the contents of the deed, so far as it described the land conveyed, when she gave her deposition, that it started at a poplar and ran up one side of the creek and down the other. When she testified before the jury she gave a more definite idea of what was contained in the deed, very much different from that given by her at the time she gave her deposition. Which was the result of her recollection of hearing the deed read, or whether both of those statements resulted from that recollection, we cannot say. If they did, then this is another proof of how uncertain her testimony is as to the contents of this deed. In fact, it may be said that she does not undertake to give the exact contents of the deed so far as it describes the property. Neither does she attempt to give the substance of it, but rather her conclusion as to what land was embraced in the deed. The possession by Lucas of this land during all these years is indicia of ownership, but when we consider that only a very small part of the area was cleared or improved; that there was nothing to indicate the extent of his possession; that according to the testimony of those in charge of the land Lucas held it simply at sufferance; that he allowed all the valuable timber to be removed from the land without claim of ownership; that he allowed it to be divided and assigned to one of the heirs of Dempsey without protest; that although more than thirty years elapsed after the destruction of this deed by fire, he never made any attempt to have it established, we cannot say but that his possession was as consistent with the theory that he was a tenant at will as that he was the owner. In fact, we think that his failure to in any way attempt to establish his title to this land during all these years; his allowing the timber to be cut therefrom; his allowing it to be partitioned and assigned to one of the heirs of Dempsey, are strong circumstances tending to support the theory now set up by the defendant, and conflict with the theory that Lucas had any title or interest in the land. Upon the

whole case we have come to the conclusion that the evidence relied upon to establish this lost deed, admitting that it is all admissible and proper evidence, falls far short of the requirements of the rule in such cases as laid down by the authorities we have cited above. This conclusion renders it unnecessary for us to consider the other assignments of error relied upon by the defendants.

The judgment of the circuit court of Cabell county will be reversed, the verdict of the jury set aside, and the cause remanded for a new trial.

*Reversed and remanded.*