JOHN DRAKE *et al.* v. FLOYD P. PARKER *et al.*

(No. 8990)

Submitted February 20, 1940.   Decided March 5, 1940.

*Harper & Baker* and *S. P. Bell,* for appellants.
*M. O. Litz* and *Grover F. Hedges,* for appellees.

HATCHER, JUDGE:

Prior proceedings in this cause were reported in 119 W. Va. 738. From the opinion there it will appear that a tract of 130 acres is in controversy; that at one time it was owned by Almeda Parker, who devised it to plaintiffs; that her husband, J. H., fraudulently obtained it from plaintiffs and devised it to his son Floyd and his daughter Sarah Carper; that the circuit court was affirmed in setting aside the deed to J. H. and his devise

to Floyd and Sarah, but was reversed in sustaining a demurrer to the averments in the answer of an executory agreement affecting the 130 acres, and was also reversed, as premature, in holding that plaintiffs owned the entire tract.

The contract alleged in the answer is that on July 7, 1904, by writing duly signed and acknowledged by all the parties affected, Almeda and J. H., "bargained and traded" to Floyd and Millard Carper, the husband of Sarah, the 130 acres, with life estates reserved, in consideration that Floyd and Millard convey from a tract of 148 acres which they owned jointly, 52 acres to Josie Smith and 96 acres, the remainder of the tract, to her husband "Herby." Josie was another daughter of Almeda and J. H. The answer alleged that the conveyance was made to Josie but did not mention a conveyance to Herby. We called attention to this failure and remanded the cause for development. Thereupon, Floyd and Sarah amended their answer to show that the 96 acres was conveyed to Herby. Millard, not theretofore a party, was made one, and adopted the averments of Floyd and Sarah regarding the contract. Evidence was taken. The circuit court decreed in favor of defendants.

The contract was not produced or recorded. Proof of its execution and its accidental destruction by fire was attempted. Floyd and his wife, and Millard and Sarah, testified concerning its contents and acknowledgment. They were not competent witnesses because they were interested in the result of this suit, and their testimony related to a personal transaction with J. H. and Almeda, now deceased. Code, 57-3-1; *Kilgore* v. *Hanley*, 27 W. Va. 451; *Freeman* v. *Freeman*, 71 W. Va. 303, 307, 76 S. E. 657. The contention of counsel is not well taken, that the testimony of Floyd and Millard was rendered competent merely because they were cross-examined concerning what consideration they received for the 96 acres from Herby himself. (More about this transaction later.) Three disinterested witnesses testified regarding the contract, two men who worked for

J. H. in 1904, and a granddaughter. The two employees testified that J. H. directed them to go with him down to Floyd's house in July, 1904, (reason for the order not stated). Both said that the persons alleged in the answer to have been present were there, signed a contract prepared and read aloud to all, by Floyd, and acknowledged the writing before Squire Nathan Westfall (now deceased); and that J. H. took it home and deposited it in a chest, having a wooden lock. One employee, aged fourteen years in 1904, said he could not state the details, but "The substance of the contract was that Millard Carper and Floyd Parker was to have the home tract of land at Almeda Parker and J. H. Parker's death in consideration of a tract of land they owned that they let Herby Smith and Josie Smith have." This witness further said that he had no interest in the contract, and had forgotten about it by 1916 when he was negotiating with J. H. for a strip of the Parker land, and was reminded by J. H. "You know this land goes to Floyd and Millard at my death * * * ". The other employee said of the contract: "The whole substance of it was that F. P. (Floyd) Parker and Millard Carper had bought a tract of land, a hundred and some acres, up on Left Hand. And this agreement was to deed the old man Parker this 52 acres, deed it to him and let him—the fact of the matter was, they just made him the deed to this land they had bought, and he suggested they deed Josie his daughter up there 52 acres, but they deeded him the 52 acres and he deeded then the 52 acres to Josie, his daughter—Josie Smith. And that was to be her dower. And then the home place at his death * * * and Almeda Parker, then * * * Floyd Parker and Millard Carper were to have the home place." It will be observed that the witness did not include a reference to the 96 acres. He became confused on cross-examination as to some of the alleged signatures to the contract and as to the presence at Floyd's of some of the alleged signers; and admitted that he had no "part of this contract clearly

in mind * * * no more than what the old man had told me, you see, afterwards."

The granddaughter testified that in 1925 she found in the kitchen of the Parker home "sticking in between the clothes press and the wall" a written contract signed and acknowledged (before Nathan Westfall) by the parties whom the answer alleges, but that Herby's name was not mentioned in the body of the writing; that "It read on about the home place there; Floyd and Millard were to have the home place * * * at J. H. and Almeda Parker's death * * * and I * * * stuck it right back where I got it." It will be noted that this witness did not say that the writing she found contained any reference to either the 52 or the 96 acres. There is no evidence of any such writing ever being seen again, though the papers of J. H. were searched after his death. In 1932, the curtain of the Parker clothes press caught fire. The man who put it out testified that he noticed nothing within the press injured, except some smouldering clothing which he removed. A domestic in the Parker home at the time, testified that in addition to the clothing, some books and papers inside the press were burned, the papers being destroyed. Several witnesses testified that both J. H. and Almeda had severally said that at their death Floyd and Millard were to have the home place.

The alleged remarks of J. H. and Almeda which tend to support the alleged contract are in conflict with their recorded writings, to-wit: (a) In July, 1904, on the same day the alleged contract was made, they, as grantee conduits of Floyd and Millard, executed to Josie a deed for the 52 acres, which provided that the conveyance was "for or in place of" her prospective heirship interest in the Parker home farm, and that her interest was "to become the property" of Floyd and Millard at the death of J. H. and Almeda. Thus the contractual rights of Floyd and Millard, approved in this deed by J. H. and Almeda and binding on them, relate only to Josie's expectant interest in the 130 acres. (b) In December of the same year Almeda attempted to convey to J. H. "the

*remainder of the remainder* of real estate owned by her * * * containing 130 acres, be the same more or less". That deed is treated as invalid by all the parties, but it does show that Almeda and J. H. failed to take into account at that time their alleged obligation, of a few months before, to Floyd and Millard for the entire 130 acres.  (c) The will of Almeda was made jointly with J. H. in 1913, was never changed, and, after her death in 1928, was recognized as valid by J. H. and probated. Its devise of the 130 acres to plaintiffs, shows that J. H. and Almeda, over a long period, continued unmindful of the alleged contract with Floyd and Millard. (d) J. H. died in 1935. His will devised Floyd 86 and Sarah 44 of the 130 acres and Floyd three-fourths and Sarah one-fourth of the proceeds of a gas lease thereon. So to the end, J. H. disregarded the alleged contract.

A writing was exhibited between Floyd, Millard and Josie, dated October 11, 1902, which arranged the trade of her prospective interest in her parents "real estate * * * (it being understood to be one-third of the real estate)" in exchange for the 52 acres which she later received, and which was referred to in the writing as the remainder of 148 acres of which Floyd and Millard had "formerly let J. H. (Herby) Smith have to contract on ninety six" acres. Floyd and Millard both testified in their examination in chief, unequivocally, that they received no consideration whatever for their deed of the 96 acres to Herby in 1904 except that stated in the alleged contract of that year. Yet on cross-examination, Floyd admitted that in 1902 he and Millard had executed a title bond to Herby for the 96 acres, thereby confirming the recital in their written contract with Josie; that the consideration was $496.66; that prior to their deed to him (in 1904) he had paid $297.46, leaving a balance of $197.20 to secure which a vendor's lien was reserved; and that later this balance was paid and the lien released. The deed itself stated the same consideration admitted by Floyd. Millard, on cross-examination, refused to commit himself as to the sums paid by Herby,

but both Millard and Floyd said Herby was to pay and did pay them what they had contracted to pay for the 96 acres. This arrangement, however, did not mean that they derived no profit from the 96 acres, for the undisputed statement of Herby shows that prior to his contract with them in 1902, they had "taken considerable timber off the tract." Herby further testified that his deal with Floyd and Millard in 1902 was "a straight out purchase" which had nothing to do with the Parker 130 acres, and that he knew nothing of the alleged contract of July, 1904. His wife, Josie, "had a stroke a few years back", since when, she said she could not remember very well; but that she had no recollection of the alleged contract.

An analysis of the competent evidence, shows that only one witness supports the allegations regarding the contract, the boy of fourteen years in 1904, who had forgotten it in 1916. Opposing his testimony are all the recorded papers of J. H. and Almeda which relate to the 130 acres; the failure of Floyd and Millard to have the alleged contract recorded; their indifference to its existence and to their alleged rights under it, until this suit was started in 1935, a period of thirty-one years; the fact that the 52 acres conveyed to Josie was in exchange for her interest in the 130 acres, only; the fact that Herby had no inheritable interest in the 130 acres to exchange for the 96 acres; and the fact that he, personally, had made an independent deal with Floyd and Millard for the 96 acres two years before the date of the alleged contract. The rule is settled that for parol testimony to establish title to land through an alleged lost instrument, proof of its execution, contents and loss must be conclusive. *Telluric Co.* v. *Bramer*, 76 W. Va. 185, 85 S. E. 177; *Lucas* v. *Hensley*, 81 W. Va. 239, 94 S. E. 138, L. R. A. 1918B, 875. The proof here does not satisfy the rule.

Counsel for defendants take the position that our former opinion adjudicated that Floyd and Millard acquired through the arrangement with Josie and her parents, a one-third interest in the 130 acres. The contract

of 1902 between Floyd, Millard and Josie, exhibited with the original answer, referred to her interest as "being understood to be one-third." The answer itself referred to Josie as "one of the three children and prospective heirs at law of Almeda Parker and J. H. Parker." We did say that "according to the answer", i. e., *according to its stricken averments,* Floyd and Millard were entitled to a one-third interest; but that was merely a construction of those averments, and not an adjudication. Upon the cause being returned to the circuit court, plaintiffs controverted the defendants' claim for affirmative relief by a special reply in writing which alleged *inter alia* that J. H. and Almeda had four children, Floyd, Sarah, Josie and Martha. The second record, without controversy, sustains that allegation and shows that Martha married a Lesher, bore two children, died about 1907, and is survived to this day by her children. Consequently, in 1904, Josie's prospective right of heirship in her parents' property was only a one-fourth interest, unless prior thereto, Martha's right of inheritance had been fully anticipated.

The decree is reversed and the cause remanded.

*Reversed and remanded.*