IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2016 Term

FILED

**April 7, 2016**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Nos. 14-1328 and 14-1329

ESTATE OF LUIGI BOSSIO a/k/a LOUIS BOSSIO,
Petitioner/Defendant Below

v.

BERNARD V. BOSSIO,
Respondent/Plaintiff Below

And

SAM BOSSIO,
Petitioner/Defendant Below

v.

BERNARD V. BOSSIO,
Respondent/Plaintiff Below

Appeal from the Circuit Court of Monongalia County
The Honorable Russell Clawges, Judge
Civil Action No. 08-C-821

AFFIRMED

Submitted:  March 1, 2016
Filed:  April 7, 2016

Jason E. Wingfield, Esq.                      Brian T. Must, Esq.
David M. Jecklin, Esq.                        Joshua D. Baker, Esq.
Michelle L. Bechtel, Esq.                     Metz Lewis Brodman Must O'Keefe
Gianola, Barnum, Bechtel, and                   LLC

Jecklin, L. C.
Morgantown, West Virginia
Attorneys for Petitioner Estate of Luigi
Bossio

Samuel H. Simon, Esq.
Matthew J. Lauman, Esq.
Houston Harbaugh, P. C.
Pittsburgh, Pennsylvania
Attorneys for Petitioner Sam Bossio

Pittsburgh, Pennsylvania
*and*
Alex J. Shook, Esq.
Hamstead, Williams & Shook, PLLC
Attorneys for Respondent

JUSTICE WORKMAN delivered the Opinion of the Court.
JUSTICE BENJAMIN dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.      "In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review."  Syl. Pt. 1, *Pub. Citizen, Inc. v. First Nat. Bank in Fairmont*, 198 W. Va. 329, 480 S.E.2d 538 (1996).

2.      The proponent of a lost or missing instrument must prove its existence and contents with clear and conclusive evidence.

3.      "A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety."  Syl. Pt. 1, in part, *In re Tiffany Marie S.,* 196 W. Va. 223, 470 S.E.2d 177 (1996).

WORKMAN, Justice:

This is an appeal of the Circuit Court of Monongalia County's orders, following a bench trial, finding that the parties are bound by the terms of a 1990 stock purchase agreement requiring petitioner Estate of Luigi Bossio to sell to Bossio Enterprises the corporate shares owned by Luigi Bossio at the time of his death in 2007. The circuit court found that respondent Bernard Bossio proved the existence and terms of a "missing" 1990 stock purchase agreement which purportedly required that Luigi Bossio's shares be redeemed by the corporation rather than passing to his Estate.

Based upon our review of the briefs, legal authorities, appendix record, and upon consideration of arguments of counsel, this Court finds that the circuit court's conclusion that respondent proved, with clear and convincing evidence, the terms of the 1990 stock purchase agreement was not clearly erroneous. Accordingly, we affirm the September 5, 2014 and December 1, 2014 orders of the circuit court.

## I.    FACTS AND PROCEDURAL HISTORY

Bossio Enterprises (hereinafter "the corporation") was formed in 1979 to own and operate Mario's Pizza located in Morgantown, West Virginia. At the time of incorporation, the shares were equally split between Luigi Bossio and each of his two sons, petitioner Sam Bossio (hereinafter "petitioner Bossio") and respondent Bernard

1

Bossio (hereinafter "respondent").[1] The corporation eventually sold off the pizza shops and its various franchises and began acquiring commercial and residential real estate. All parties agree that in 1981, discussions were had among the Bossios about entering into a stock purchase agreement which would require the corporation to purchase the shares of any deceased member such that ownership and management of the corporation would remain with the original owners and any surviving spouses would not obtain an interest in the corporation.

*The 1982 Stock Purchase Agreement*

To that end, respondent testified that in 1981 Joseph Marshalek, the corporation's in-house accountant and CFO, suggested and facilitated the formation of a stock purchase agreement, which was prepared by Morgantown attorney David Straface. At trial, respondent introduced an unsigned draft document purporting to be the 1982 stock purchase agreement, asserting that the original, executed document could not be located.[2] The document further contains handwritten notes which Mr. Marshalek acknowledged were his notations for purposes of discussing the various provisions of the agreement with the Bossios. Respondent testified that he, his father and brother all executed the document in Mr. Marshalek's office in 1982 and placed the agreement in a

---

[1] Respondent has been and continues to be estranged from his siblings, deceased father, and surviving mother for greater than 10 years.

[2] The unsigned draft agreement contains a number of blank spaces where dates, addresses, and values are omitted. This document was produced in discovery; it is not clear from the record which party produced it or where it was discovered.

manila envelope marked "buy/sell agreement," which was then placed in the company safe in his office. The manila envelope, which was empty when respondent went to retrieve it for purposes of this litigation, was introduced into evidence. Respondent testified that he had not been in his office in the warehouse where the safe was housed for many years. Respondent denied that any copies of the agreement were made. Mr. Marshalek testified somewhat cryptically that although he did not recall "specifically" that the stock purchase agreement was executed in 1982, he recalled "generally" that the agreement was executed to the "best of his recollection." Mr. Straface had no recollection of preparing such a document, but his file contained a copy of the unsigned draft agreement which was introduced into evidence. Petitioner Bossio could not recall executing such a document, but testified that it was "possible." Petitioner Bossio further testified that he paid little attention to the legal minutiae of the corporation. The executor of the petitioner Estate, Antoinette Summers, had no personal knowledge of the execution of the agreement, nor did Luigi's widow, Emilia Bossio.

Critically, the draft 1982 stock purchase agreement required the corporation to maintain life insurance policies on each of the members, the proceeds from which would be utilized to redeem any deceased member's shares in accordance with the agreement. The agreement further provided that the agreement would terminate in the event any of the insurance policies lapsed, thereby presumably depriving the corporation of the funds and ability to redeem any deceased member's stock. The unsigned agreement introduced at trial also contained an attached schedule of insurance reflecting

3

that three separate policies of $100,000 were procured on the members from Equitable, along with the policy numbers. It is undisputed that these policies were in fact purchased and lapsed in early 1996 for non-payment of premiums.

*The 1990 Stock Purchase Agreement*

Respondent testified that at some point in 1990, a decision was made to revise the 1982 stock purchase agreement. Respondent testified that the corporation had been forced to borrow against the policies and was having difficulty making the premium payments; therefore, the agreement was to be revised to eliminate the requirement of the life insurance policies to fund redemption of the stock. Mr. Straface was again allegedly retained to revise the agreement and respondent alleges that he and petitioner Bossio executed the new agreement in Mr. Marshalek's office and then took it to their father, who executed it at his home. Petitioner Bossio, again, had no recollection of executing such an agreement but could not "rule it out." Respondent testified that the agreement was placed in the same manila envelope in the company safe as the 1982 agreement. No copy of this purported document—signed or unsigned, draft or otherwise—was produced at trial. Mr. Marshalek had no recollection of whether such a document was prepared or executed. However, Mr. Straface produced a copy of the 1982 draft agreement from his

4

file, which contained his handwritten note "did new K [contract] 1990."[3] Moreover, the stock certificates contained a typewritten endorsement on the back which reads:

> This certificate is transferable only upon compliance with the provisions of an agreement dated 10-1-90, among Bossio Enterprises, Inc., Louis Bossio, Sam Bossio and Bernard Bossio, a copy of which is on file in the Office of the Secretary of the Corporation.

Respondent testified that the only substantive difference between the 1982 and 1990 stock purchase agreements was that the life insurance requirement was made optional, rather than mandatory, and that any reference to the agreement terminating upon lapse of the policy was eliminated. Respondent introduced a partially executed stock purchase agreement from BHM Enterprises (an unrelated company which Respondent, petitioner Bossio, and two cousins formed), which he maintains is identical to the 1990 stock purchase agreement and similarly reflects these revisions. Respondent's testimony about the alleged changes and substance of the 1990 stock purchase agreement which he seeks to enforce was the only evidence on that issue.

Luigi Bossio died testate in 2007 and his ten shares of stock in the corporation are not mentioned in his will.[4] As a result, the shares passed to his estate as

---

[3] In addition, Mr. Straface produced a letter from Attorney Bill Frame, who represented respondent's ex-wife in their divorce, requesting the stock purchase agreement and other documents. The majority of the other documents were "checked," indicating they were possessed or produced, but the stock purchase agreement was "circled."

personal property; the petitioner Estate refused to sell the shares back to the corporation. Respondent filed the instant action seeking to enforce the alleged terms of the purported 1990 stock purchase agreement, demanding that petitioner Estate sell the shares back to the corporation, which would thereby increase his interest in the corporation from one-third to one-half. A bench trial was held following which the circuit court entered an order concluding that respondent had proven that the parties intended to enter into an arrangement where, upon the death of one of the shareholders of the corporation, the corporation would purchase the stock of the deceased shareholder and that such an agreement was executed in 1982 and revised in 1990.[5] The circuit court further found that the 1990 agreement was identical in all respects to the 1982 agreement except that it eliminated the life insurance requirement and the "consequences" of not having life insurance, *i.e.* the termination of the agreement as a whole. This appeal followed.

---

[4] Luigi Bossio's daughter and Executor of the Estate, Antoinette Bossio Summers, testified that she was present for the preparation of her father's will and that no discussion of a stock purchase agreement was had, but that she believed her father intended for his stock to go into trust to care for her mother upon his death. Luigi Bossio's widow, Emilia Bossio, testified similarly.

[5] Notably, despite the absence of any signed agreements, the parties do not expressly accuse each other of having destroyed or hidden the agreements—simply that they were not found where they were kept, *i.e.* in a manila envelope in the company safe. In fact, no discussion or explanation is given for where the signed documents, assuming they existed, might be. The circuit court made no findings, and appeared to assume, that the agreements at issue were in fact lost or missing.

6

## II.   STANDARD OF REVIEW

> In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Pub. Citizen, Inc. v. First Nat. Bank in Fairmont*, 198 W. Va. 329, 480 S.E.2d 538 (1996).  Although the circuit court's findings are contained in the order under the heading "conclusions of law," its findings with regard to the existence and content of the subject stock purchase agreements are plainly findings of fact, subject to a clearly erroneous standard.  With these standards in mind, we turn to the parties' arguments.

## III.   DISCUSSION

Although both petitioners set forth four assignments of error, all assignments essentially assert that the circuit court erred in finding that respondent established, with the requisite degree of evidentiary certainty, the agreements' existence, execution, and contents.  Respondent contends that he produced uncontroverted evidence of the agreements and their substance and that petitioners failed to present sufficient evidence to challenge his evidence or credibility.

As a threshold matter, we observe that Rule 1004(a) of the West Virginia Rules of Evidence provides that an original writing is not required to prove its contents where "[a]ll the originals are lost or destroyed, and not by the proponent acting in bad

7

faith[.]"[6] In that event, "secondary evidence" is permitted to prove the existence and content of a writing.[7] All parties appear to agree that, although West Virginia has no blanket syllabus point governing all writings, this Court has traditionally followed the general rule that "a high degree of proof from one seeking to establish a lost instrument is required." *Marshall v. Elmo Greer & Sons, Inc.*, 193 W. Va. 427, 429, 456 S.E.2d 554, 556 (1995). The *Marshall* Court further cited with approval caselaw regarding lost deeds which consistently holds that "proof that [the deed] existed, and of its contents, must be clear and conclusive." *Id.* (citing Syl. Pt. 1, *Lucas v. Hensley*, 81 W. Va. 239, 94 S.E. 138 (1917)); *see also* Syl., *Drake v. Parker*, 122 W. Va. 145, 7 S.E.2d 651 (1940) ("For parol testimony to establish title to land through an alleged lost instrument, proof of its execution, content and loss must be conclusive."); Syl., *Telluric Co. v. Bramer*, 76 W.

---

[6]In other jurisdictions, there is a fairly common threshold requirement that a party establish that a "diligent" search was first made for the document and that the proponent did not destroy it in bad faith. *See* McCormick on Evidence, § 237 at 715 (7th Ed.) ("Loss or destruction may sometimes be provable by direct evidence, such as testimony from a witness who destroyed the document. But more often the only available evidence will be circumstantial, usually taking the form of testimony that an appropriate search for the document has been made without locating it.").

Although the circuit court made no specific finding as to the circumstances under which the purported stock purchase agreements became "missing," no party appears to be expressly accusing the other of destroying or hiding the document(s) in bad faith. More importantly for our purposes, however, despite petitioner Bossio's reference in his brief that the circuit court made no findings about the circumstances of the lost documents, neither petitioner assigns the failure to do so as error.

[7] W.V.R.E. 1008(a) and (c) provides that the "jury" determines "whether the asserted writing . . . ever existed . . . [and] whether other evidence of content correctly reflects the content." Inasmuch as this was a bench trial, the circuit court acted as the finder of fact.

8

Va. 185, 85 S.E. 177 (1915) ("To establish or set up a lost instrument rising to the dignity and importance of a muniment of title, the evidence of its former existence, loss and contents must be clear, strong, and conclusive."); *cf. Stump v. Harold*, 125 W. Va. 254, 260, 23 S.E.2d 656, 659 (1942) (holding that where a missing instrument relates only "collaterally" to the relief sought, "the strict rule of proof in legally resurrecting and establishing a lost instrument is inapplicable.").

This precedent is in accord with the majority of jurisdictions: "The courts have used a variety of terms to describe the standard or degree of proof required to establish the existence and contents of a lost instrument, generally resting most heavily on the clear and convincing standard." 52 Am. Jur.2d *Lost and Destroyed Instruments* § 35 (2015). Although variations apply in actions on different types of instruments, a heightened standard of proof is common where fraud is a concern "such as proving the existence and contents of a lost will or oral contract." *Id.* Even courts which have adopted a lower standard for certain standard commercial documents[8] have recognized the necessity of a heightened standard where the underlying dispute possesses a "unique vulnerability to fraud," such as oral contracts or wills. *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 810 F. Supp. 1420, 1425 (D. Del. 1992). We therefore hold that the proponent of a lost or missing instrument must prove its existence and contents with clear and conclusive evidence.

---

[8] *See* 52 Am. Jur.2d Lost and Destroyed Instruments § 38 (2016) for discussion regarding lost insurance policies.

Our new syllabus point notwithstanding, no party asserts that the circuit court was under a misapprehension about the level of proof generally required, nor argues that a lesser standard of proof is appropriate. No party expressly raises the issue of whether the purported agreement(s) were truly lost or missing. Moreover, petitioners do not suggest that secondary evidence was not appropriate to prove the content of the agreements. Rather, the parties simply disagree as to whether the evidence was sufficient to "clearly and conclusively" establish the existence and contents of the stock purchase agreements.

Petitioners' primary contention is that respondent offered only uncorroborated, self-serving testimony to establish the existence and contents of the two agreements. In that regard, petitioners cite to *dicta* contained in *Thompson v. Stuckey*, 171 W. Va. 483, 486, 300 S.E.2d 295, 298 (1983), stating that "the oral testimony of the beneficiary alone is a slender reed upon which to support a judgment[.]" Petitioners argue that the only evidence that either the 1982 or 1990 agreements were actually executed was that of respondent and that, more importantly, there is no evidence of the 1990 agreement's *contents* other than respondent's testimony. Petitioners argue further that if any agreement was proven to have existed, it was the 1982 agreement which terminated under its own terms due to lapse of the life insurance. Petitioners argue strongly that even if the existence of both agreements is presumed, the contents of the final, allegedly binding 1990 agreement were established only through the self-serving, uncorroborated testimony of respondent, which is insufficient.

10

Respondent, on the other hand, argues that he produced ample corroborative evidence including the draft document and exemplar of the agreement modifications and that petitioners are merely challenging the credibility and weight of his evidence rather than its sufficiency. In that regard, we acknowledge that commentators on the federal equivalent of Rule 1004 have noted that there is no particular "hierarchy" of secondary evidence and that any and all such evidence must be afforded its due regard as determined by the trier of fact:

> [O]nce Rule 1004's conditions are met, the party seeking to prove the contents of a writing ... may do so by *any* kind of secondary evidence ranging from photographs and handwritten copies to oral testimony of a witness whose credibility is suspect. Of course, *the opponent may attack the secondary evidence's sufficiency, including the witness's credibility. This attack, however, goes not to the evidence's admissibility but to its weight and is a matter for the trier of fact to resolve.*

5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 1004.02[1] (1996) (emphasis added).

While there is little to no instructive caselaw in West Virginia regarding types and adequacy of secondary evidence, there is ample caselaw elsewhere that clearly suggests that respondent's evidence was sufficient to support the circuit court's findings. First, the cited *dicta* from *Thompson* notwithstanding, respondent's testimony regarding the agreements' substance cannot be disregarded; it is merely a type of secondary evidence to be afforded appropriate weight by the trier of fact. "A corollary of the rule that the contents of lost documents may be proved by secondary evidence is that the law does not require the contents of such documents be proved verbatim." *Dart Indus., Inc.*

11

*v. Commercial Union Ins. Co.*, 52 P.3d 79, 86 (Cal. 2002). More specifically, "'[i]t is not necessary, in order to admit evidence of the contents of a lost instrument, that the witnesses should be able to testify with verbal accuracy to its contents; it is sufficient if they are able to state it in substance.'" *Id*. at 86 (quoting *Kenniff v. Caulfield*, 73 P. 803, 806 (Cal. 1903)).

Insofar as the corroborative evidence respondent presented—which was largely ignored by petitioners—each type has been found by other courts to be adequate secondary evidence sufficient to establish an agreement's existence and terms. The original proposed version of a lost agreement has been held to be sufficient circumstantial evidence of its contents. *American Sav. and Loan Ass'n of Florida v. Atlantic Inv. Corp.*, 436 So.2d 442 (Fl. Dist. Ct. App. 1983). Moreover, production of a comparable agreement drafted by the same attorney for a related party has been found sufficiently corroborative. *Jurek v. Couch-Jurek*, 296 S.W.3d 864 (Tex. App. 2009). Finally, evidence of an unsigned document, where the parties acted in accordance with its terms, has been found to be sufficient corroborative evidence. *Farmers Co-Op Ass'n v. Cooper*, No. 05-1042, 2006 WL 1231663 (Iowa Ct. App. Apr. 26, 2006). Respondent produced not merely one, but *all* of these types of evidence.

As Justice Cleckley explained,

[a] finding is clearly erroneous when, although there is evidence to support the finding, *the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed*. However, a reviewing

> court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. Pt. 1, in part, *In re Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177 (1996) (emphasis added). In light of the corroborative evidence adduced and the circuit court's unique position to assess the credibility of the witnesses, we cannot say that we are left with a "definite and firm conviction" that the circuit court erred.

Petitioners attempt to paint respondent's evidence as being wholly uncorroborated and self-serving; however, he produced ample corroborative evidence, none of which petitioners expressly denied or even raised doubt as to its veracity. There seems to be little question that both the 1982 and, more importantly the 1990 stock purchase agreements existed—respondent testified to the existence and content of both agreements and produced an unexecuted draft of the 1982 agreement.[9] Mr. Straface's notes indicated he prepared a new agreement in 1990, and the stock certificates reference

---

[9] We are mindful that "a contract or agreement is not equivalent to the piece of paper it is written on. That is, the paper evidences the agreement, but the agreement exists separately from the piece of paper." *Phillips v. Grace Hosp.,* 580 N.W.2d 1, 4 (Mich. Ct. App. 1998); *see also Clarke v. Fiedler,* 113 P.2d 275, 280 (Cal. Ct. App. 1941) ("After all, the formal written contract is not the agreement of the parties, but only evidence of that agreement."); *Schwartz v. Shapiro,* 40 Cal. Rptr. 189, 196 (Cal. Ct. App. 1964) (same); 14 Cal. Jur. 3d Contracts § 1 ("In legal contemplation, a contract is neither oral nor written, but oral or written evidence may be received to establish the terms of the contract; the formal written contract is not the agreement of the parties; it is only evidence of that agreement."). In light of our standard of review, we cannot conclude that the circuit court's findings were clearly erroneous and therefore affirm the circuit court.

13

not only the agreement, but a date certain ("10-1-90") upon which it was executed. Again, *no* witness on behalf of petitioners denied the existence of the agreement; rather, petitioner Bossio merely testified that he did not recall signing it and could not "rule it out." His lack of recollection does not negate the existence of the agreement; it merely fails to corroborate it.[10]

More to the point, petitioners have failed to explain how the court's conclusion that the 1990 stock purchase agreement eliminated the insurance and related termination provision was clearly erroneous. While no draft of this agreement was produced, respondent testified as to its substance and provided an exemplar prepared by the same attorney for an entity containing many of the same members of the corporation. Respondent's explanation for why the revised 1990 agreement was necessary was uncontroverted, *i.e.* that the business was in dire financial straits and could not afford the insurance premiums required by the 1982 agreement. No witness testified that the corporation's members no longer wished for the corporation to redeem a deceased member's shares—the original and *only* purpose of the stock purchase agreement. In

---

[10] Petitioner Bossio admitted that he "had not even looked" for the stock purchase agreements and testified that he did not need to look because he knows such documents are not within his files. On the other hand, multiple attempts were made by respondent to obtain the agreements from other sources, *i.e.* respondent's divorce attorney and the circuit court divorce file, but none were located. Moreover, petitioner Bossio insinuated that the safe where the documents were located was not particularly secure since multiple people had access to the safe, including one employee who embezzled from the company, but failed to articulate what motive anyone other than the signatories to the agreement may have to destroy it.

14

fact, had the members so desired the agreement to lapse in its entirety, they could have simply let the agreement terminate by virtue of the lapse of the insurance policies. There was no other reason for revising the agreement in 1990 offered other than to eliminate the insurance and related termination provision, which had become a financial burden to the company. In sum, petitioners left respondent's evidence wholly unchallenged, deciding instead to rest on his burden of proof as a defense.

## IV.    CONCLUSION

Therefore, we affirm the circuit court's September 5, 2014, and December 1, 2014 orders.

Affirmed.

15